1  John L. Smaha, Esq., Bar No. 95855
2  Gustavo E. Bravo, Esq., Bar. No. 218752
   SMAHA LAW GROUP
3  7860 Mission Center Court, Suite 100
   San Diego, California 92108
4  Telephone: (619) 688-1557
   Facsimile: (619) 688-1558
5
6  Proposed Attorneys for Debtor, Wave House Belmont Park, LLC

7  Mark A. Maasch (CSB#120637)
   TURNER & MAASCH, INC.
8  550 West C Street, Suite 1160
   San Diego, California 92101
9  Telephone (619) 237-1212
   Facsimile (619) 237-0325

10 Proposed Special Litigation Counsel for Plaintiff, Wave House Belmont Park, LLC

11

12          UNITED STATES BANKRUPTCY COURT
            SOUTHERN DISTRICT OF CALIFORNIA
13

14  In re                          )   CASE NO. 10-19663-LT11
                                    )
15  WAVE HOUSE BELMONT PARK, LLC,   )   Chapter 11
                                    )
16      Debtor                      )
                                    )
17  _____ )
                                    )
18  WAVE HOUSE BELMONT PARK, LLC, a )   Adversary No.
    California limited liability company corporation, )
19                                  )   **COMPLAINT FOR DECLARATORY**
        Plaintiff,                  )   **RELIEF AND INJUNCTIVE RELIEF**
20                                  )
            vs.                     )
21                                  )
    THE CITY OF SAN DIEGO; and DOES 1 through )
22  10, inclusive.                  )
                                    )
23      Defendants                  )
    _____ )

24      Plaintiff, Wave House Belmont Park, LLC, hereby alleges as follows:

25      1.  Plaintiff, Wave House Belmont Park, LLC ("WHBP"), is a California limited liability

26  company with its principal place of business in the City and County of San Diego. WHBP is a

27  debtor in possession in that certain Chapter 11 case reference above.

28

*Law Offices*
TURNER & MAASCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101-3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

2.    Defendant, the City of San Diego ("City") is a municipal corporation under the laws of the State of California, located within the County of San Diego and the owner of the underlying property which is the object of this action.

3.    This action  is a proceeding arising in or related to a case under Chapter 11 of the Bankruptcy Code.  This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(a), 1334(b), 11 U.S.C. § 105 and General Order 312-D of the United States District Court, Southern District of California.  This action is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (G), and (O).  Venue is proper in the Southern District of California pursuant to 28 U.S.C. § 1409(a) because the claims for relief presented herein arise in or are related to the underlying bankruptcy case which is currently pending.

## GENERAL FACTUAL BACKGROUND

4.    On or about March 4, 1987, City entered into a lease (the "Lease") with Belmont Park Associates, a California limited partnership, for the property commonly known as Belmont Park, allowing Belmont Park Associates to construct, operate and maintain a commercial and recreational center which incorporated the historic plunge pool ("Plunge").  A copy of the Lease is attached as Exhibit 1 and incorporated herein by reference.

5.    The Lease was assigned from Belmont Park Associates to PARS Belmont Park, LLC on or about December 1, 1995, which subsequently assigned the lease to Wave The Planet, LLC on June 22, 2000, which subsequently assigned the Lease to Wave House San Diego, LLC on May 10, 2002.  Wave House San Diego, LLC paid six million ($6,000,000) to acquire the leasehold interest in contemplation of the future development as provided in Lease modifications referenced below. The Lease was subsequently assigned to a related company, WHBP, on August 22, 2004.  (Because the name of the lessee has changed over the term of the Lease, the term "lessee" shall refer to that entity to which the Lease had been assigned at the particular time being discussed.)

6.    The Lease has been modified by a series of five operating memoranda.  The Fifth Operating Memorandum ("5OM") was entered into between the City and WHBP's predecessor in interest, Wave the Planet, LLC, on June 26, 2000.  A copy of the 5OM is attached as Exhibit 2 and incorporated herein by reference.

Law Offices
TURNER & MAASCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101-3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

1479.12\b\01

2

1    7.  At the time 5OM was entered into, Belmont Park was in a rundown condition.  Despite

2    redevelopment efforts by the prior developers, the project did not generate sufficient income to

3    become a viable project. Consequently, maintenance had been deferred and the project was in a

4    state of disrepair, pedestrian traffic was significantly reduced, criminal behavior became rampant,

5    and vacancy in the commercial and retail space was in excess of fifty percent (50%).  The Plunge at

6    the time  had only 400 members and was also in need of significant maintenance and repairs.

7    8.  Tom Lochtefeld, who was a member of Wave the Planet, LLC, and is the manager of

8    WHBP, had a vision to revitalize Belmont Park which involved capital improvements including

9    new water attractions based on standing wave machines and other attractions.  The concept was to

10   split the revitalization into two phases.  Phase I would address the immediate issues with Belmont

11   Park, and create a more vibrant and inviting attraction.  The idea was to create an aquatic recreation

12   area that would serve to redefine Belmont Park from its sordid past and blight.  While Phase I was

13   expected to increase business in the then moribund Belmont Park, it was not expected to make

14   Belmont Park economically viable.  Because the preservation of the Plunge at the lessee's expense

15   was a requirement of the Lease, the project would continue to operate at a loss during this

16   development, the size of which was dependent on the lessee's rental obligation to the City.  Thus,

17   financial incentives in the form of rent credits were negotiated.  These credits were based in part on

18   investment made in the particular phase. Phase II, on the other hand, was envisioned to include a

19   new hotel and other improvements that were intended to create profit centers that would make the

20   overall project more viable, allow for the needed structural improvements and continued

21   maintenance to preserve the historic Plunge building for years to come and to pay rents more

22   commensurate to market rates.

23   9.  The terms of 5OM are consistent with that overall intent.  Indeed, the agreement recites

24   that it is the desire of the parties to "revitalize Belmont Park" by including "park visitor-oriented

25   commercial and recreational uses."  Another company headed by Mr. Lochtefeld, Wave Loch Tool

26   & Die, LLC, was to be hired by the lessee to manage the revitalization of Belmont Park.

27

28

Law Offices
TURNER & MAASCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101- 3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

1479.12\b\01

3

10. The 5OM provided in ¶ 3 that the lessee "must construct, operate, and maintain" the new features contemplated by the Supplemental Development Plan which was attached to the agreement as Exhibit 2. The plan called for 2 phases at a total projected cost to the lessee of $13,000,000.

11. Phase I of 50M called for the lessee to invest $4,000,000 in improvements, including deferred maintenance items, new wave machines and water recreational features designed to "increase the attractiveness of the existing Plunge and provide an aquatic recreational sports draw for the adjacent boardwalk restaurants and … common area plazas; new parking options, and beach rentals and food service". As an inducement for these improvements, the City agreed to $4,000,000 in rent credits.

12. Phase II of 50M called for the lessee to submit a Phase II Capital Improvement Plan within 6 years (approximately June 2006) for an estimated $9,000,000 in additional improvements, that included new water recreation attractions, including a "Cirque de Soleil" style water show, a new parking structure , a shuttle service, and the refurbishment and adaptive reuse of the Plunge building. As to the latter, the Development Plan provided as follows:

> In order to insure continued operation of the Plunge swimming pool, the Plunge Building requires major renovation in order to overcome design flaws and permit an economically viable adaptive re-use. LESSEE shall consider commercial uses within a historically rehabilitated Plunge Building which would serve park and beach visitors, including but not limited to: an upper level hotel; a surrounding beach culture and retail arcade; participatory water attractions and games. (Emphasis added)

13. The hotel was to be the main element of Phase II. It was the anticipated hotel which would create the economic engine to make the entire project economically viable. Without the agreement to these Phase II improvements, it made no sense for the lessee to incur the cost of the Phase I improvements. The whole point of the two phases was to make the project economically viable such that the lessee could pay the rents anticipated under the lease. Representatives for both the City and lessee anticipated a project that would be much larger in magnitude than the $9,000,000 provided in the 5OM. According to representatives of the City at the time, the concept was to create parity, so that both landlord and lessee had obligations and commitments going

Law Offices
TURNER & MAASCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101- 3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

1   forward as to the improvements, with the ultimate magnitude left open to the planning and financial

2   parameters which the lessee could accomplish.

3      14. The 5OM was approved by the City Council. To provide assurance to Mr. Lochtefeld

4   and his entities the lessee would not need further City Council approval for Phase II, the agreement

5   authorized the City Manager to undertake such acts as necessary for the implementation of the two

6   phases. In reliance on the City's agreement for both phases of development, the lessee went

7   forward with the Phase I improvements.

8      15. In reliance on the City's commitments in the 5OM, Wave the Planet commenced the

9   improvements envisioned in Phase I. In 2002, Mr. Lochtefeld acquired sole ownership of Wave the

10  Planet, and subsequently transferred the leasehold to Wave House San Diego, LLC. Phase I

11  improvements were completed by WHSD. If the lessee had not had a commitment from the City as

12  to Phase II, the lessee would not have gone forward with the acquisition of Wave the Planet, or

13  undertaken the improvements for Phase I. The simple fact was that incurring the expense of the

14  Phase I improvements made no economic sense without the City's commitment to allow the Phase

15  II improvements, as it was the latter phase that would create the economic engine to drive the

16  project.

17     16. Toward that end, the 5OM also provided the City Manager with the broad authority to

18  negotiate for, and commit the City to, the development plan for Phase II to be put forward by the

19  lessee and that no further City Council approval was required as to these matters.

20     17. As provided in the 5OM, the City gave rent credits to the lessee that were equal to the

21  minimum improvements required under Phase I. These are referred to in the 5OM as "Tier 2" rent

22  credits. The rent credits were in consideration for lessee's undertaking the expense of the

23  improvements without any real prospect of recovering those costs from operations, as the project

24  did not generate sufficient cash flow to both service debt and pay full rent. Pursuant to the terms of

25  the Lease, the minimal cash rent portion of the Lease after credits were to be $70,000, which is what

26  the lessee paid.

27     18. The 5OM also anticipated that rent credits might be necessary to make Phase II

28  improvements financially feasible. Thus it provided for Tier 3 rent credits to be applied in a similar

Law Offices
TURNER & MAASCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101-3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

1479.12\b\01                                5
                              ———————————————
                                  Complaint

Law Offices
TURNER & MAASCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101-3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

1 fashion to the Tier 2 rent credits, which Mr. Lochtefeld as manager of the lessee understood

2 committed the City to provide dollar for dollar rent credits up to the $9,000,000 of improvements

3 provided in the 5OM, depending on the economic viability of the project based on those Phase II

4 improvements. This was a critical component, as both the City and Mr. Lochtefeld knew that the

5 project as then configured was not capable of sustaining full rent payments called for in the Lease

6 after the Tier 2 credits were exhausted. The City's chief negotiator and Mr. Lochtefeld intended

7 that Tier 3 credits, which the City Manager had been given authority to establish, would be

8 available by the time that the Tier 2 credits were exhausted. Neither intended or envisioned that the

9 lessee would be making full rent payments under the Lease upon the expiration of the Tier 2 credits

10 unless and until the project could sustain such incurred rent.

11      19. After completing Phase I improvements at a cost in excess of $4,000,000, the lessee

12 began work on developing plans for Phase II. The lessee expended considerable time, effort and

13 money in developing those plans. The lessee through Mr. Lochtefeld submitted a development plan

14 in December 2006, which called for a 250 room hotel and other collateral improvements that would

15 transform Belmont Park into a more dynamic and inviting area, and create an attraction that would

16 extend beyond the summer season, and thereby reducing the seasonable drop in business after

17 summer that has always plagued Belmont Park as a commercial and recreational venture.

18      20. The City's initial reaction to the Phase II plan was positive. Accordingly, Mr.

19 Lochtefeld on the lessee's behalf continued work on the development plans, and engaged potential

20 hotel and development partners to undertake the development of the hotel and retail improvements.

21 However, in 2008, the City failed to give the necessary approvals to allow the process to proceed

22 further. Despite Mr. Lochtefeld's request for comments as to specific objections the City might

23 have, or any changes to the development plan, the City simply did not timely respond.

24      21. In May, 2008, the City, acting through the head of its Real Estate Assets Department,

25 James Barwick, began questioning the economic viability of the project as the perceived grounds

26 for delaying necessary approvals. This was precisely the type of situation the 5OM had been

27 structured to prevent. The terms of the 5OM had been negotiated between Mr. Lochtefeld and the

28 City to provide that the City Council had already approved Phase II and had authorized the City

1479.12\b\01

6

1    Manager to implement the redevelopment by issuing the necessary approvals and allowing for rent

2    credits that would assure the economic viability of the redevelopment.

3    　　22. However, in the years between the execution of the 5OM and the submission of the

4    Phase II plans, the City experienced a change in administrations, and shifted from a City Manager

5    to a strong mayor form of governance. According to some involved in the negotiations, the current

6    City administration was not enthusiastic about the prospect of allowing the construction of a hotel at

7    Belmont Park, which was to be the center piece of, and the financial engine for, the continued

8    preservation of the Plunge and the economic viability of Belmont Park as a whole. The City's

9    position had the effect of eviscerating the certainty that Mr. Lochtefeld had negotiated into the 50M

10   which bound both sides to go forward with redevelopment.

11   　　23. Regardless, the lessee continued to work with the City. Thus, in response to Mr.

12   Barwick's questioning of the viability of the hotel project, Mr. Lochtefeld and the lessee retained

13   Hotel and Leisure Advisors to do a study to show the feasibility of the Phase II project. Despite that

14   study which showed the economic viability of the Phase II project, Mr. Barwick informed Mr.

15   Lochtefeld on July 25, 2008, that the City would not support the Phase II development at that time.

16   Instead Mr. Barwick requested that WHBP, which was now the lessee, develop a new alternate plan

17   to operate Belmont Park "as is", and work with the City on setting a new sustainable rent that would

18   allow WHBP to operate Belmont Park and maintain the Plunge based on the current state of

19   operations.

20   　　24. Although the City was equivocating on its commitment under the 5OM, and WHBP was

21   fully prepared to proceed with Phase II, the lessee agreed to explore other possibilities that would

22   allow Belmont Park to persevere, with the expectation that at some time in the future, the City

23   would honor its commitment to allow the Phase II redevelopment and tier 3 rent credits.

24   　　25. Toward that end, WHBP retained Economic Consulting Services to advise on solutions

25   that would allow the parties to sustain operations for the time being on an "as is" basis. Their report

26   in November 2008 made a number of recommendations such as paid parking, additional

27   commercial, recreational and dining uses, and to base the ground rent under the Lease on the

28

Law Offices
TURNER & MAASCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101- 3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

Complaint

1  amount of tenant rents actually collected rather than gross sales.  Thereafter the City did not respond

2  to their suggestions, other than to dismiss the paid parking idea out of hand.

3      26. The City then asked for a rent survey as part of an effort to negotiate a sustainable rent,

4  and suggested the firm of ERA, whom WHBP retained.  ERA's study showed that, given the

5  conditions that existed and the expense of maintaining and operating the Plunge, the sustainable rent

6  on a current operations basis was actually zero.  In other words, the income derived from the

7  property was sufficient for the continued maintenance and operation of Belmont Park and the

8  Plunge only if there was no additional cash rent.

9      27.  The City then suggested a profit sharing approach.  Again, in an effort to work with the

10  City in the hopes of at least keeping Belmont Park sustainable, WHBP retained ERA to do another

11  study on that type of approach.  On March 17, 2009, WHBP made a proposal to the City based on

12  the second ERA study.

13      28. On April 24, 2009, Mr. Barwick informed Mr. Lochtefeld that the City was no longer

14  interested in a profit sharing approach either.

15      29. WHBP thereafter continued to try to negotiate with the City to arrive at a sustainable

16  rent that would allow for the continued operations of Belmont Park and the continued maintenance

17  and operation of the Plunge on an "as is" basis with no further development.  However, the City on

18  or about June 25, 2010 unilaterally and unexplainably for the first time took the position that it had

19  no obligation to support Phase II under the 5OM, and advised WHBP that it would be liable for the

20  full rent provided in the Lease once the Tier 2 rent credits expired.  Taking this position had the

21  effect of increasing the cash portion of the rent from $70,000 to approximately $767,000 per year.

22      30. Because such rents could not be supported by the revenue stream generated by Belmont

23  Park in its current configuration, and because the City was as of June 25, 2010 in actual breach of

24  the Lease and the 5OM, WHBP refused to pay the unjustified rent demanded by the City but

25  continued to tender rent based upon $70,000 per year it had been paying.  Since that time, the City

26  has failed to conduct meaningful negotiations and continued to fail to act in good faith.  The City on

27  October 12, 2010 declared WHBP to be in formal default under the Lease, and threatened to

28  commence unlawful detainer proceedings to remove WHBP from the property.  The City also gave

1479.12\b\01                              8

Complaint

Law Offices
TURNER & MAASCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101-3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

1  a 30 day notice of default to East West Bank and demanded that the bank cure the default or lose its

2  security interest in the Lease. These combined actions prompted the filing of the within Chapter 11

3  bankruptcy proceeding.

4      31. If the City is allowed to terminate the Lease, under § 63.50 of the Municipal Code

5  (Proposition G), all "vested" development rights will also terminate.  In the event Proposition G is

6  fully operational, the City cannot re-let the property to a third-party operator.  Rather, the City will

7  be obligated to return the development to open park land, which will deny any financial benefits to

8  the City and force it to incur the expense of operating and maintaining the Plunge, something the

9  City has never been in a position to do. That creates the very real possibility that Belmont Park will

10  return to the gang infested blight on the neighborhood that it was prior to the efforts by WHBP and

11  its predecessors to revitalize the area.

12      32. WHBP has incurred significant debt from East West Bank in excess of $16,000,000 to

13  refinance the prior loans that financed the original development of Belmont Park, the Phase I

14  improvements, and provide the necessary seed money for Phase II.  This loan was obtained in

15  reliance on the City's commitment to allow Phase II development as provided in the 5OM.  If the

16  City is allowed to terminate the lease, WHBP will wrongfully lose everything that it has invested in

17  Belmont Park along with any right to future anticipated profits and income.

18      33. The City induced Mr. Lochtefeld, and the entities he was working through at the time

19  including now WHBP, to turn Belmont Park around with the promise that they would be allowed to

20  develop a financially viable project.  Now that Belmont Park was rescued by investment of over

21  $17,000,000, the City wants to walk away from its commitments and wrongfully cause WHBP to

22  absorb the loss to its damage.

**FIRST CAUSE OF ACTION**

**Declaratory Relief**

25      34. Plaintiff realleges paragraphs 1 through 33 above as though fully set forth herein.

26      35. An actual controversy has arisen between WHBP and the City in the following respects:

27          a.   WHBP contends that it is entitled to develop Phase II, and that the City is obligated

28              to approve Phase II, subject only to good faith requests for modifications based on

Law Offices
TURNER & MAASCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101- 3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

the City's interests, and to provide Tier 3 rent credits to the extent needed to assure the financial viability of Belmont Park, up to $9,000,000. The City, on the other hand, contends that it is not obligated under the 5OM to approve Phase II or even allow Phase II to proceed, or to give any rent credits to offset WHBP's expenses in developing Phase II.

b.  WHBP contends that by blocking the development of Phase II, City has breached the Lease and the 5OM, such that it is now obligated or legally estopped to maintain the level of the cash portion of rent at $70,000 per year, the minimum specified in ¶ 3.04 of the Lease. The City contends that it can demand full rent with only Tier 1 credits as an offset, making the annual rent $767,000.

c.  WHBP contends that, as an alternative, and in light of the City's refusal to allow Phase II to proceed, that the City is obligated to accept a sustainable rent as independently determined, and to extend the term of the lease, such that WHBP can refinance the debt it incurred in reliance on the 5OM, and continue to manage and operate Belmont Park at a viable state of profitability. The City contends that it has so such obligation but instead needs only demand payment of rent at the inflated amount of $767,000 per year.

d.  WHBP contends that based on the City's breach of the Lease and 5OM, the City is obligated to provide WHBP with additional time to get plans approved and to construct the Phase II improvements. WHBP also contends that rent must stay at $70,000 per year during this period and that appropriate tier 3 rent credits must be given after development has been completed. The City contends there is no right to construct Phase II improvements at all and the tier 3 rent credits are no longer available.

e.  WHBP contends that if the Lease is terminated and all "vested" rights are lost that pursuant to Proposition G Belmont Park will be required to be returned to park usage and that the City will be required to maintain the Plunge as provided thereunder.

Law Offices
TURNER & MAASCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101- 3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

1   The City contends that Proposition G does not apply to its efforts to deliver the

2 premises to a new operator under a new lease.

3   36. A judicial declaration is warranted such that the parties can determine their respective

4 rights and obligations, allow the Lease and the development rights to continue in effect, and permit

5 the parties to proceed in a fashion which will allow for the continued existence of Belmont Park.

6          **SECOND CAUSE OF ACTION**

7       **INJUNCTIVE RELIEF (11 U.S.C. § 105)**

8   37. Plaintiff realleges paragraphs 1 through 34 above as though fully set forth herein.

9   38. If the City is allowed to declare the Lease in default and terminate the Lease prior to the

10 Court determining the merits of the within action WHBP will suffer irreparable damage in that its

11 vested development rights in Belmont Park will be lost for all time and WHBP will not have the

12 ability to continue development on this unique piece of real property.  In addition, WHBP would

13 lose a unique piece of property which it has helped to develop, such that there is no adequate

14 remedy at law.

15   39.  If the City is allowed to give notice of default to East West Bank, and force it to

16 exercise its optional right to cure, assume the Lease, or be foreclosed from proceeding against the

17 leasehold prior to the within matter being determined on the merits, WHBP will likewise be

18 irreparably harmed.  Depending on which option East West Bank chooses, WHBP could lose the

19 property, or be deemed to have waived its right to dispute the amount of rent, and/or lose its ability

20 to successfully formulate and implement a plan of reorganization.

21   40. Injunctive relief on a preliminary and permanent basis is needed under 11 U.S.C. § 105

22 to maintain the status quo and allow WHBP to exercise its rights as a debtor-in-possession, to

23 preserve the value of WHBP's most significant asset, and to preserve its vested development rights

24 pending a determination on the mertis.

25   WHEREFORE, Plaintiff prays for the following relief:

26   1. On the First Cause of Action, for a declaration by the Court, as follows:

27      a. That WHBP is not in breach of the Lease or the 5OM, and that such contracts

28       are not subject to termination by the City;

Law Offices
TURNER & MAASCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101- 3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

Law Offices
TURNER & MAASCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101-3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

1       b.   That the City has breached the Lease;

2       c.   That WHBP is entitled under the Lease and 5OM to develop Phase II, and the

3       City is obligated to negotiate Tier 3 rent credits and an extension of the Lease

4       in a manner consistent with the intent of the parties at the time the 5OM was

5       negotiated and executed; that in the interim, the base rent for Belmont Park is

6       to be at the stated minimum of $70,000 per annum; that because of the

7       actions by the City, WHBP is entitled to additional time to obtain approval of

8       Phase II plans and complete redevelopment.

9       d.   That because of the City's breaches, the base rent for the property needs to be

10      established in this proceeding.

11      e.   That if the Lease is terminated and all "vested rights" are lost that the City

12      will be required to return the premises to park use as required by Proposition

13      G.

14      2.   On the Second Cause of Action, for a preliminary and permanent injunction pursuant to

15   11 U.S.C. § 105 enjoining the City from the following:

16      a.   Declaring the Lease in default, or terminating the Lease, or engaging in any

17      other act that adversely affects WHBP's development rights under the Lease

18      and the 5OM and/or giving notice to East West Bank of any default under the

19      Lease or otherwise requiring it to exercise its right to cure or assume the

20      Lease until after the Court has determined the rights and obligations of the

21      parties under the Lease and the 5OM pursuant to the First Cause of Action,

22      and any offsetting damages that WHBP may be entitled to on claims that will

23      be asserted against the City under the California Tort Claims Act.

24

25   ///

26   ///

27   ///

28   ///

1479.12\b\01

Complaint

1    3.   For costs and fees incurred in this action.

2    4.   Such other and further relief as the Court deems just and equitable.

3

Dated:  November 18, 2010                    SMAHA LAW GROUP

4

5

6                                            By:  /s/ John L. Smaha
                                                  John L. Smaha
7                                                 Plaintiff, Wave House Belmont Park,
                                                  LLC
8    W:\Wave House Belmont\Complaint.rev 11-15-10.doc

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Law Offices
TURNER & MAASCH, INC.
550 West C Street, Suite 1160
San Diego, California, 92101- 3540
TELEPHONE (619) 237-1212; FAX (619) 237-0325

1479.12\b\01                          13

# EXHIBIT 1

BELMONT PA        CIATES

RECEIVED

AUG 1 1 1986

ECO. DEV. / PROP. DEPT.


RECEIVED

ECO. DEV. /PROP. DEPT.

THE CITY OF SAN DIEGO

_____

Percentage Lease

REV. 5-29-86    6/9/86

executed  3/5/87

LEASE OUTLINE

| SECTION | PARAGRAPH | PAGE |
|---|---|---|
| SECTION 1: | USES | 1 |
| 1.01 | Premises | 1 |
| 1.02 | Uses | 1 |
| 1.03 | Related Council Actions | 2 |
| 1.04 | Quiet Possession | 2 |
| 1.05 | Easements and Reservations | 2 |
| 1.06 | Competent Management | 3 |
| 1.07 | Hours of Operation | 3 |
| 1.08 | No Competition | 3 |
| 1.09 | Parking | 3 |
| 1.10 | Swimming Pool | 4 |
| 1.11 | Community Meeting Room | |
| | | |
| SECTION 2: | TERM | 4 |
| 2.01 | Commencement | 5 |
| 2.02 | Holdover | 5 |
| 2.03 | Quitclaim and Surrender of LESSEE'S Interest | |
| | | |
| SECTION 3: | RENT | 5 |
| 3.01 | Place of Payment | 6 |
| 3.02 | Rent | 9 |
| 3.03 | Rent Credit | 10 |
| 3.04 | Payment Computation and Procedure | 11 |
| 3.05 | Gross Income | 11 |
| 3.06 | Inspection of Records | 13 |
| 3.07 | Delinquent Rent and Audit(s) Fees | 14 |
| 3.08 | Unauthorized Use Charge | |
| | | |
| SECTION 4: | ASSIGNMENT | 14 |
| 4.01 | Time is of Essence; Provisions Binding on Successors | 14 |
| 4.02 | Assignment and Subletting | 15 |
| 4.03 | Encumbrance | 16 |
| 4.04 | Defaults and Remedies | 19 |
| 4.05 | Eminent Domain | 20 |
| 4.06 | Partnership Liability | |
| | | |
| SECTION 5: | INSURANCE RISKS/SECURITY | 20 |
| 5.01 | Indemnity | 21 |
| 5.02 | Insurance | 23 |
| 5.03 | Waste, Damage or Destruction | 23 |
| 5.04 | Security Deposit | |

LEASE OUTLINE

CTION            PARAGRAPH                                          PAGE

CTION 6:    IMPROVEMENTS/ALTERATIONS/REPAIRS
    6.01    Acceptance of Premises                                   24
    6.02    Entry and Inspection                                     24
    6.03    Maintenance                                              25
    6.04    Improvements/Alterations                                 25
    6.05    Utilities                                                26
    6.06    Construction Bond                                        26
    6.07    Liens                                                    26
    6.08    Taxes                                                    27
    6.09    Signs                                                    27
    6.10    Ownership of Improvements                                27
    6.11    Unavoidable Delay                                        28
    6.12    Development Plan                                          28
    6.13    Failure to Meet Development Schedule                     29
    6.14    Coastal Commission Approval                              29


CTION 7:    GENERAL PROVISIONS
    7.01    Notices                                                  29
    7.02    Compliance with Law                                      29
    7.03    CITY Approval                                            30
    7.04    Nondiscrimination                                        30
    7.05    Equal Opportunity                                        30
    7.06    Partial Invalidity                                       30
    7.07    Legal Fees                                               30
    7.08    Number and Gender                                        30
    7.09    Captions                                                 30
    7.10    Entire Understanding                                     31
    7.11    Partnership Authority                                    31
    7.12    Standard of Employees                                    31
    7.13    Right of First Refusal                                   31
    7.14    Roller Coaster Lease                                     32


CTION 8:    SIGNATURES                                               33
    EXHIBIT A:   LEGAL DESCRIPTION OF PREMISES
    EXHIBIT B:   LIENS AND ENCUMBRANCES
    EXHIBIT C:   DEVELOPMENT PLAN
    EXHIBIT D:   PUBLIC IMPROVEMENTS
    EXHIBIT E:   SCHEDULE OF POOL OPERATIONS

CITY OF SAN DIEGO
PERCENTAGE LEASE

THIS LEASE AGREEMENT (the "Lease") is executed between the CITY OF SAN DIEGO, a municipal corporation, hereinafter called "CITY," and BELMONT PARK ASSOCIATES, a California limited partnership, hereinafter called "LESSEE."

SECTION 1:   USES

1.01   Premises.  CITY hereby leases to LESSEE and LESSEE leases from CITY all of that certain real property situated in the City of San Diego, County of San Diego, State of California, described in Exhibit "A" attached hereto and by this reference made part of this agreement.  Said real property is hereinafter called the "Premises."  The Premises shall be free and clear of all encumbrances except as set forth on Exhibit "B" attached hereto.

1.02   Uses.  It is expressly agreed that the Premises are leased to LESSEE for park and recreation uses, specifically for the construction, operation and maintenance of a park/visitor-oriented commercial and recreational center, as described in the Development Plan attached as Exhibit "C" hereto (the "Development Plan"), and for such other related or incidental purposes as may be first approved in writing by the City Manager, which approval shall not be unreasonably withheld, and for no other purpose whatsoever.

LESSEE acknowledges that the Premises are part of a dedicated public park and agrees to use the property only for purposes as described above.  LESSEE covenants and agrees to use the Premises throughout the term hereof for the above specified purposes and to diligently conduct or cause the business to be conducted thereon to produce the most gross income that can be reasonably expected.  Failure to continuously use the Premises for said purposes, or the use of the Premises for purposes not expressly authorized herein, shall constitute a default under the terms hereof.

1.03   Related Council Actions.  By the granting of this Lease, neither the CITY nor the Council of CITY is obligating itself to any other governmental agent, board, commission, or agency with regard to any other discretionary action relating to development or operation of the Premises.  Discretionary action includes, but is not limited to, rezonings, variances, environmental clearances, coastal approval, building permits, Certificate of Occupancy and any other governmental agency

approvals which may be required for the development and opera-
tion of the Premises ("discretionary approvals").  The City
Manager agrees to cooperate in processing of applications for
discretionary approvals.

1.04    Quiet Possession.  LESSEE, paying the rent and performing the
covenants and agreements herein, shall at all times during the
term peaceably and quietly have, hold and enjoy the Premises.
If CITY for any reason cannot deliver possession of the
Premises to LESSEE at the commencement of the term, or if
during the Lease term LESSEE is temporarily dispossessed
through action or claim of a title superior to CITY'S, then
and in either of such events, this Lease shall not be
voidable, but there shall be determined and stated in writing
by the City Manager of CITY a proportionate reduction of the
minimum rent for the period or periods during which LESSEE is
prevented from having the quiet possession of all or a portion
of the Premises.  Any actions in condemnation or contemplation
thereof shall be subject to Section 4.05 of this Lease.

1.05    Easements and Reservations.

a.    CITY hereby reserves all rights, title and interest in
any and all subsurface natural gas, oil, minerals and
water on or within the Premises.

b.    CITY reserves the right to grant and use easements or
establish and use rights-of-way over, under, along and
across the Premises for utilities, thoroughfares, or
access as it deems advisable for the public good.

c.    CITY has the right to enter the premises for the purpose
of making repairs to or developing municipal resources
and services.

Notwithstanding the foregoing, CITY shall not unreasonably or
substantially interfere with LESSEE'S use of the Premises and
will reimburse LESSEE for physical damages, if any, to the
permanent improvements located on the Premises resulting from
CITY'S exercising the rights reserved in this section.  Such
reimbursement may include a reduction in the rent propor-
tionate to the amount of physical damage as determined by the
CITY.  CITY will pay the costs of maintenance and repair of
all CITY installations made pursuant to these reserved rights.

1.06    Competent Management.  Throughout the term of this Lease,
LESSEE shall provide competent management of the Premises to
the reasonable satisfaction of the City Manager.  For the
purposes of this paragraph, "competent management" shall mean
demonstrated ability in the management and operation of a

-2-

commercial center and related activities in a fiscally responsible manner.

1.07   Hours of Operation.  LESSEE shall include in any assignments or subleases a provision requiring that such businesses remain open during usual and customary hours for the similar businesses in San Diego and as reasonably appropriate to service the park visitors.

1.08   No Competition.  CITY agrees that it will not renew any existing contracts or enter into new contracts during the term of this Lease which contracts would involve sales of goods or services which are available from time to time on the Premises on City-owned property within one hundred (100) yards of the Premises, excluding uses on property over which CITY has no proprietary control.

1.09   Parking.  LESSEE shall provide and maintain on the Premises no less than three hundred twenty-five (325) parking spaces on site, generally in accordance with the development plan attached hereto, unless precluded by the CITY due to condemnation or other actions instituted or imposed by the CITY or other governmental agencies having the power to change same. LESSEE may, on the east parking lot on the premises subject to the review of the City Council and any other legally required reviews, charge a fee or require validation for parking on the Premises or a portion of said Premises, which revenue shall be subject to the percentage rent described in Section 3.02(c) - All Other Operations.

1.10   Swimming Pool.  During the entire term of the Lease, LESSEE or its sublessee shall be responsible for the operation and management of an indoor swimming pool on the Premises.  The pool operation shall provide for the following:

a.   The pool is to be made available on a regular schedule, with hours of operation subject to prior written approval of the City Manager and LESSEE.  The initial schedule of operations is attached hereto as Exhibit C, Development Plan.

b.   Admission and fees are to be comparable to those established by operators of similar pools in the Southern California area unless it can be demonstrated to the reasonable satisfaction of the City Manager that an economic hardship exists because of the uniqueness of the indoor pool operation, thereby justifying a higher fee.

c.   The City Manager will approve hours of operation and associated rates prior to implementation.  In the event

-3-

that the City Manager does not respond to a written
request for approval within twenty (20) days of receipt
of same, LESSEE may consider said request approved.

d.   Access may be limited at certain times for specific
activities such as children's learn-to-swim programs,
scuba lessons, and swimming team programs. All programs
will be available to the general public on an approved
day use fee.

1.11   Community Meeting Room.  During entire the term of this lease,
LESSEE or its sublessees shall be responsible for management
and maintenance of a community meeting room as shown on the
Development Plan.  The room shall be made available for public
use under the following guidelines:

a.   The meeting room shall be made available to the general
public on a scheduled basis.

b.   Commercial activities in the room will be preempted for
scheduled public service uses, subject to the notice to
and approval by LESSEE or its sublessee, which approval
shall not be unreasonably withheld.

c.   The LESSEE or its sublessee can charge fees associated
with setting up meeting facilities, if any.

d.   Any fees charged will be equivalent to LESSEE'S cost for
labor, plus directly related overhead, if any, for the
event.

SECTION 2:   TERM

2.01   Commencement.  The effective date of this Lease shall be the
date of execution by the City Manager.  The term of this Lease
shall be fifty (50) years commencing on the first day of the
calendar month following the receipt of all discretionary
approvals required by governmental authorities having juris-
diction to approve same as described in Section 1.03
("Commencement Date") or July 1, 1988, whichever date or event
first occurs.  "Lease year" as used in this Lease shall mean
each 12-month period following the Commencement Date.  City
Manager and LESSEE shall execute and record a Memorandum of
Lease in recordable form within thirty (30) days after the
Commencement Date which confirms the existence of this Lease
term hereof and other provisions reasonably necessary to
provide notice of the terms of this Lease to any sublease
assignee or mortgagee.  Any costs incurred in completing the
foregoing, except CITY staff time, shall be borne by LESSEE.

-4-

2.02   Holdover.  Any holding over by LESSEE after expiration or
       termination shall not be considered a renewal or extension of
       this Lease.  The occupancy of the Premises after the expira-
       tion or termination of this agreement constitutes a month-to-
       month tenancy, and all other terms and conditions of this
       agreement shall continue in full force and effect; provided,
       however, CITY shall have the right to apply a reasonable
       increase in rent to bring the rent to fair market value and to
       terminate the holdover tenancy at will.

2.03   Quitclaim and Surrender of LESSEE'S Interest.  On execution of
       this Lease, LESSEE shall deliver to the CITY a quitclaim deed
       in recordable form quitclaiming all its rights in the
       Premises.  Subject to the rights of any mortgagee as set forth
       in Section 4.03, CITY may record such deed only on the expira-
       tion or earlier termination of this Lease, and no conveyance
       of the reversion or possessory rights shall be deemed to have
       occurred until recording of said deed.  In the event the CITY
       requires any subsequent quitclaim deed, LESSEE or its succes-
       sor in interest shall deliver the same within fifteen (15)
       days after receiving written demand therefor.

       If LESSEE fails or refuses to deliver the required deed, CITY
       may prepare and record a notice reciting the LESSEE'S failure
       to execute this Lease provision and the notice will be conclu-
       sive evidence of the termination of this Lease and all LESSEE
       rights to the Premises.

SECTION 3:   RENT

3.01   Place of Payment.  All rents required herein must be made
       payable to the City Treasurer and mailed or delivered to the
       Office of the City Treasurer, City of San Diego, P. O. Box
       2289, San Diego, California, 92112-4165.

       The place of payment may be changed at any time by CITY upon
       thirty (30) days written notice to LESSEE.  Mailed rental
       payments shall be deemed paid upon the date such payment is
       postmarked by the postal authorities.  LESSEE assumes all risk
       of loss and late payment charges if payments are made by mail,
       or if postmarks are illegible, in which case the payment shall
       be deemed paid upon actual receipt by the City Treasurer.

3.02    Rent.

a.    Minimum Rent.  The annual minimum rent established for
the first five (5) years following the commencement date
of this Lease is Seven Hundred Five Thousand Two Hundred
Eight Dollars ($705,208) which is Fifty-Eight Thousand
Seven Hundred Sixty-Seven Dollars and 33 Cents
($58,767.33) on a monthly installment basis (the "Minimum
Rent").

Monthly payments of minimum rent shall be reduced by
one-twelfth (1/12) of the rent credit, as described in
Section 3.03, and may be augmented, or reduced by per-
centage rent, to the extent percentage rent exceeds the
total minimum rent paid within a Lease Year, as described
in this Section 3.02.  Such computation shall be made on
a cumulative basis during each Lease Year as described in
Section 3.04.

b.    Minimum Rent Adjustment.  Effective at the beginning of
the first day of the sixth Lease year of this Lease and
at the beginning of each three (3) year period thereafter
during the term, the annual minimum rent shall be
adjusted to eighty percent (80%) of the annual average of
actual rents paid or accrued during the three (3) years
preceding the adjustment date.  Said annual minimum rent
shall then be divided by twelve (12) to establish the new
monthly minimum rent.  It is recognized that such adjust-
ments shall be calculated by CITY upon completion of
payments due for the preceding rental period in order to
determine the amount of the adjustment to be effective on
the dates stated herein.  Until such calculations are
completed, LESSEE shall continue paying monthly minimum
rents at the prior rate.  Any additional rents determined
by the adjustment to be due for the months previously
paid at the prior rate shall be paid to CITY within
thirty (30) days following written notice.  In no event
shall any such minimum rent adjustment result in a
decrease in the minimum rent in effect immediately prior
to the adjustment date.

c.    Percentage Rents.  "Percentage Rent" will be calculated
on a calendar month basis and will consist of the
following percentages of the gross income resulting from
the use of the premises:

-6-

| Percentages | Business Activities |
|---|---|
| Three Percent (3%) | Specialty Shops |
| Three Percent (3%) | Food |
| Five Percent (5%) | Game Rooms |
| Five Percent (5%) | Alcoholic Beverages |
| Five Percent (5%) | Pool Operations, but only if operated by other than a qualified nonprofit corporation under the Internal Revenue Code. |
| Seven Percent (7%) | All Other Operations |

The City Manager in his sole discretion, may approve
another percentage rate or flat rate of rent for each
other incidental service or operation supplementary to
the permitted use(s) set forth under Section 1.02, Uses,
hereof as may be approved in writing by the City Manager
prior to commencement of such other service(s) or
operation(s).  Provided, however, any activity conducted
on the premises without prior approval by the City
Manager shall be subject to the requirements of Section
3.07, Unauthorized Use Charge, hereof.

Percentage rent payable each month during a Lease Year
shall be reduced by one-twelfth (1/12) of the rent
credit, as described in Section 3.03, and minimum rent
paid to date during such Lease Year pursuant to Section
3.02a.  Such computations shall be made on a cumulative
basis during each Lease Year as described in Section
3.04.

d.   Percentage Rate Adjustment.  At least four (4) months
prior to the end of the fifteenth Lease Year and at least
four (4) months prior to the end of each ten-year period
thereafter, the parties hereto, by mutual consent or
through appraisal as hereinafter set forth, will adjust
the percentage rates of LESSEE'S gross income to be paid
CITY, if appropriate, effective upon the first day of the
succeeding ten-year period.  Said adjustment will be made
to the degree necessary to provide a fair rental to CITY
as determined by the City Manager and LESSEE, taking into
consideration the criteria set forth in Section 3.02e.
below.  In the event that such adjustment is not made by
mutual consent prior to two (2) months before the end of
said rent review periods, then the parties hereto will,
at the CITY'S sole option, refer the matter to appraisal
under the terms hereinafter set forth.  If CITY elects
not to go to appraisal, then the rent shall remain
unchanged.

e.  Percentage Rate Appraisal. In the event the parties do
    not agree upon the amount of adjustment to said per-
    centage rates as provided for in the previous section,
    then the adjustment, if any, shall be determined by a
    qualified professional independent real estate appraiser
    selected by mutual consent of the parties to this Lease
    Agreement from the list of appraisers approved by CITY.
    In the event the parties do not reach agreement as to
    selection of a mutually acceptable appraiser, then CITY
    and LESSEE shall each select a qualified professional
    independent real estate appraiser who in turn will select
    a third qualified professional independent real estate
    appraiser, which third appraiser will be employed to set
    the percentage rates to be applied to LESSEE'S percentage
    rate adjustment. In the event a mutually acceptable
    third appraiser is not agreed upon between the two
    selected appraisers within ten (10) days, then the third
    appraiser will be appointed by the presiding judge of the
    Superior Court of the State of California, County of San
    Diego, acting in his or her individual capacity, upon
    application by either CITY or LESSEE with prior notice
    thereof to the other party. In the event that the
    Superior Court judge declines to make the appointment,
    the parties hereto agree that the third appraiser shall
    be promptly determined in accordance with the rules of
    the American Arbitration Association. Said third
    appraiser shall complete the assignment within sixty (60)
    days of appointment. Each party shall pay the cost of
    its own selected appraiser and both CITY and LESSEE agree
    to equally share the cost of the third mutually selected
    or court-appointed appraiser. CITY and LESSEE agree to
    accept and be bound by the percentage rates determined by
    the appraiser selected or appointed to complete the
    assignment.

    In establishing the percentage rates for the items under
    controversy, the appraiser shall consider CITY'S property
    as a fee simple absolute estate, and as vacant and avail-
    able for a full Lease Term equal to the initial full term
    of Lease on the open market for the authorized purposes
    of this Lease at the commencement of the rental period
    under review. The appraiser will be guided by prevailing
    market percentage rates for similar operations for ground
    leases primarily within the Southern California area, if
    available. In the event the appraisal is not completed
    in time to permit the percentage adjustment, if any, to
    be made upon the applicable commencement of the
    succeeding period, LESSEE agrees to continue to pay
    Percentage Rent in accordance with the then existing

-8-

rates and any adjustment, when determined, will be retro-
active to said effective date of rental adjustment as
hereinabove established. Any deficiency shall be paid by
LESSEE to CITY within sixty (60) days after determination
of the new percentage rate(s). IN NO EVENT, HOWEVER,
SHALL ANY RENT ADJUSTMENT RESULT IN ANY DECREASE IN ANY
PERCENTAGE RENTAL RATES.

3.03    Rent Credit. LESSEE shall construct the public improvements
described on Exhibit D, attached hereto and incorporated by
reference herein, (the "Public Improvements") within the time
frame as set forth in the Development Plan. In consideration
for same, CITY shall provide an annual rent credit ("Rent
Credit") in an amount equal to the debt service constant on a
loan, or a portion of a loan if the loan amount includes
public improvements and private improvements, times the total
cost of the public improvements and related indirect costs
until such costs have been repaid, together with applicable
interest expense. "Indirect Costs" shall be 36.3% of the
actual construction costs of public improvements. However, in
no event shall LESSEE be given a rent credit for Indirect
Costs in excess of $1,495,886. Any loan shall be arranged by
LESSEE at competitive market interest rates. LESSEE shall
attempt to negotiate CITY'S right to repay all or a portion of
the loan of CITY'S option, without penalty. Ninety percent
(90%) of any percentage rent in excess of the minimum rent and
rent credit for each Lease Year shall be used to reduce the
principal balance of the loan for public improvements and
indirect costs. CITY shall hold such funds and apply them
annually against the remaining balance of cost for public
improvements and indirect costs.

Rent credit shall be based upon the actual cost of construc-
tion of the public improvements paid by LESSEE with invoices
approved by the City Manager, plus 36.3% of such amount for
indirect costs and applicable loan interest expense. In no
event shall the total rent credit exceed $5,617,700. No such
improvements for which any rent credit is given shall be
removed by LESSEE at any time, without prior written approval
of the City Manager, including upon expiration or earlier
termination of this Lease. One-twelfth (1/12) of the rent
credit shall be applied against monthly installments of mini-
mum rent and/or percentage rent due to CITY until the balance
is fully repaid. CITY shall not be liable for any unused rent
credit upon expiration or early termination of this Lease.
Rent credit shall accrue on the loan commencing as of the
completion of construction of each portion of the public
improvements and payment therefor by LESSEE or payment by
LESSEE of indirect costs.

-9-

3.04    **Payment Computation and Procedure.** On or before the last day of the calendar month following the calendar month in which the gross income subject to percentage rent was earned, LESSEE shall provide CITY with a correct statement together with a payment of minimum rent, and percentage rent, if any, on all applicable gross receipts, in a form approved by CITY. The statement will be signed by LESSEE or its authorized agent, attesting to the accuracy thereof, which shall be legally binding upon LESSEE. Each statement will indicate or include:

a.  The minimum rent due to date in any Lease Year.

b.  Total gross receipts for the subject month and totaled for such Lease Year, itemized as to business categories for which separate percentage rents are established. A gross receipts breakdown of each business conducted on the Premises must be included when a reported category shows gross income to be from more than one business operation.

c.  The percentage rent, if any, computed and totaled for the month and Lease Year.

d.  The accumulated total of all minimum rent and percentage rent paid for the current Lease Year.

e.  Payment in the greater of the two following amounts: minimum rent or percentage rent due to date during such Lease Year reduced by the rent credit accrued to date during such Lease Year. In no event shall the rent actually paid in any Lease Year following the commencement date be less than Seventy Thousand Dollars ($70,000) per year or Five Thousand Eight Hundred Thirty-Three Dollars and 33 cents ($5,833.33) per month; provided that, credit shall be given for any monthly payments exceeding Five Thousand Eight Hundred Thirty-Three Dollars and 33 cents ($5,833.33) during each Lease Year for subsequent months (i.e. the monthly minimum amount shall be computed upon a cumulative basis so that the average is at least equal to said minimum payments..

Any rents due CITY from sublease activities or operations will begin with the earliest of the following dates (whether or not prior approval was given by CITY as required by this Lease, and whether or not a separate percentage rent was established by CITY):

(1)  Sublease commencement date.

(2)  Receipt of all discretionary approvals.

(2)  Receipt of all discretionary approvals.

3.05    Gross Income.  "Gross income or receipts" as used in this
Lease, shall include all income resulting from occupancy of
the leased Premises from whatever source derived whether
received or to become due.  Provided, however, gross income
shall not include federal, state or municipal taxes collected
from the consumer (regardless of whether the amount thereof is
stated to the consumer as a separate charge) and paid over
periodically by, LESSEE, or any sublessee, permittee,
licensee, or their agents to a governmental agency accompanied
by a tax return or statement as required by law.  Possessory
interest taxes or other property taxes shall not be deducted
by LESSEE in computing gross income.  Gross income shall not
include refunds for goods returned for resale on the premises
or refunds of deposits.  The amount of such taxes and refunds
shall be clearly shown on the books and records of LESSEE.
The percentage rent shall be calculated and paid by LESSEE on
the basis of said gross income whether the income is received
by LESSEE or by any sublessee, permittee or licensee, or their
agents, and all gross income received by any sublessee,
permittee, licensee, or other party as a result of occupancy
of said premises or the operation thereof shall be regarded as
gross income of LESSEE for the purpose of calculating the
percentage rent hereunder required to be paid by LESSEE to
CITY, except as may be otherwise specified by or pursuant to
this Lease.

In the event that LESSEE has exercised all reasonable means to
collect percentage rent from a sublessee, permittee, licensee,
or their agent, as determined by the City Manager, and is
thereafter unable to collect such percentage rent, the City
Manager may relieve LESSEE of payment with respect to such
percentage rent if, in his sole discretion, he determines such
payment would be unfair to LESSEE based upon the actions of
collection undertaken by LESSEE.

3.06    Inspection of Records.

a.    Records.  LESSEE shall, at all times during the Lease
term, keep or cause to be kept true and complete books,
records and accounts of all financial transactions in the
operation of all business activities conducted upon and
financial transactions resulting from the use of the
premises.  The records shall be supported by source docu-
ments such as sales slips, daily cash register tapes,
purchase invoices or other documents as necessary to
allow CITY to reasonably determine the total gross
income.

-11-

Any retail sales or charges will be recorded by means of cash registers or other comparable devices which display to the customer the amount of the transaction and automatically issues a receipt. The registers will be equipped with devices that lock in sales totals and other transaction numbers and sales details that are not resettable. Totals registered shall be read and recorded at the beginning and end of each business day.

In the event of admission charges or rentals, LESSEE shall issue serially numbered tickets for each such admission or rental and shall keep an adequate record of such tickets, as well as a record of unissued tickets.

All retail sales and charges may be recorded by a system other than cash registers or other comparable devices provided such system is approved by CITY.

b. Financial Statements. Within ninety (90) days after the end of each Lease year as previously established herein, LESSEE will, at its expense, submit to CITY a statement in which the total gross receipts and the corresponding amounts of rents paid CITY for the year are classified according to the categories of business established for any percentage rental and for any other business conducted on or from the premises. Said statement shall be signed by LESSEE or its authorized agent, attesting to the accuracy thereof, which shall be legally binding upon LESSEE.

c. Right to Inspect. All LESSEE'S books of account, records and supporting documentation, as described under Section 3.05a. Records will be kept for at least five (5) years and made available to CITY in one location within the City of San Diego. Said books and records shall be maintained separate from all other accounts not relating to the leased premises. The CITY, at its discretion, shall have the right to inspect and audit the business of LESSEE, its agents, sublessees, concessionaires and licensees operating on and in connection with the Premises as necessary and appropriate for CITY to determine the amounts of rent due CITY in compliance with the requirements of this Lease.

At CITY'S request, LESSEE shall promptly provide, at LESSEE'S expense, any necessary data reasonably available to LESSEE to enable CITY to fully comply with all requirements of the state or federal government for Lease information or reports concerning the premises. Such data will include, if required, a detailed breakdown of LESSEE'S receipts and expenses.

   d.  Audit Cost.  The full cost of CITY'S audit(s) will be
       borne by CITY unless one or both of the following condi-
       tions exists, in which case LESSEE hereby agrees to pay
       CITY'S cost of audit(s):

       (1)  The audit(s) reveal an underpayment of more than
            five percent (5%), between the rent due as reported
            and paid by LESSEE pursuant to this Lease and rent
            due as determined by the audit(s); or

       (2)  LESSEE has failed to maintain complete and true
            books, records, accounts and supporting source docu-
            ments in strict accordance with this section hereof.

       LESSEE shall pay any deficiency determined by the
       audit(s) plus interest on such amount as defined in
       Section 3 Delinquent Rent and Audit(s) Fees, hereof,
       within thirty (30) days of notice thereof by CITY.  CITY
       will credit any overpayment against incoming rents.  Any
       overpayment determined after the end of this Lease will
       be refunded by CITY within thirty (30) days of confirma-
       tion by the City Manager of the audit(s) findings.

   e.  Default.  LESSEE'S failure to keep complete and accurate
       records by means of double entry bookkeeping and make
       them available for CITY inspection is, like all other
       failures to comply with covenants of this Lease, a breach
       of this Lease and cause for termination.

       Notwithstanding the foregoing, LESSEE shall not be deemed
       in default under the terms hereof, if LESSEE has provided
       for the foregoing requirements in the respective Lease of
       any sublessee, licensee, or permittee, or their agent,
       has exercised reasonable legal means to compel
       compliance, and thereafter is unable to secure same.

3.07  Delinquent Rent and Audit(s) Fees.  If LESSEE fails to pay the
      rent when due, LESSEE will pay in addition to the unpaid
      rents, Five percent (5%) of the delinquent rent. If the rent
      is still unpaid at the end of fifteen (15) days after written
      notice of delinquency is deposited in the mail, addressed to
      LESSEE in accordance with the notice provision set forth under
      Paragraph 7.01 hereof, LESSEE shall pay an additional Five
      percent (5%) [being a total of Ten percent (10%)] which is
      hereby mutually agreed by the parties hereto to be appropriate
      to compensate CITY for loss resulting from rental delinquency,
      including lost interest, opportunities, legal costs, and the
      cost of servicing the delinquent account.

In the event CITY audit(s) if applicable, discloses that the rent for the audited period(s) has been underpaid in excess of five percent (5%) of the total required rent, then LESSEE shall pay CITY the cost of the audit(s) plus ten percent (10%) per year on the amount by which said rent was underpaid in addition to the unpaid rents as shown to be due CITY as compensation to CITY for administrative costs and loss of interest as previously described herein.  In the event CITY audit(s) discloses that the unpaid rent is less than five percent (5%) of the total rent, and should LESSEE fail to pay said unpaid rent within thirty (30) days after written notice from CITY, an additional fee of ten percent (10%) of said unpaid amount shall be added to the unpaid amount to compensate CITY for costs and losses due to such nonpayment.  LESSEE agrees to pay such amounts and further agrees that the specific late charges represent a fair and reasonable estimate of the costs that CITY will incur from LESSEE'S late payment. Acceptance of late charges and any portion of the late payment by CITY shall in no event constitute a waiver of LESSEE default with respect to late payment, nor prevent CITY from exercising any of the other rights and remedies granted in this Lease.

3.08    Unauthorized Use Charge.  LESSEE shall pay CITY twenty percent (20%) of the gross receipts for any service or use that is not permitted by this Lease.  This payment is subject to the due date provided in this Lease for rental payments, and the provision for delinquent rent.  The existence of the twenty percent (20%) charge in this clause and the payment of this charge or any part of it, does not constitute an authorization for a particular service or use, and does not waive any CITY rights to terminate a service or use or to default LESSEE for participating in or allowing any unauthorized use of the leased premises.

SECTION 4:    ASSIGNMENT

4.01    Time is of Essence; Provisions Binding on Successors.  Time is of the essence of all of the terms, covenants and conditions of this Lease and, except as otherwise provided herein, all of the terms, covenants and conditions of this Lease shall apply to, benefit and bind the successors and assigns of the respective parties, jointly and individually.

4.02    Assignment and Subletting.  LESSEE shall not assign this Lease, or any interest therein, or sublet the premises or any part thereof, without the prior written consent of City Manager, which approval shall not be unreasonably withheld.

-14-

The following assignments or subletting shall not require the consent of City Manager:

a.  Any user which occupies an area of less than 5,000 square feet who executes a standard Lease form previously approved by City Manager where the described use of the premises has been previously approved in the Development Plan or by the City Manager;

b.  Any subsequent assignment or subletting of a tenant where (i) the use of the premises does not change with such assignment and (ii) the credit worthiness of the assignee or sublessee is equal to or greater than the assignor or the assignor or sublessor is not relieved of liability in connection with such assignment;

c.  Any assignment to any mortgagee by operation of law as with foreclosure, a deed in lieu thereof, or under threat of foreclosure.

When consent is required by City Manager, such consent shall be based upon verification that any assignee or sublessee (i) has financial capability equal to or greater than assignor or assignor is not relieved of liability under the terms thereof and (ii) such assignee possesses or engages management skills equal to or greater than the assignor.

City Manager shall approve or disapprove any requested assignment or sublease, describing the reasons therefor, within twenty (20) days after presentation by LESSEE and, in the event that no response is received during such period, such assignment shall be deemed approved.

Except for the foregoing, any such assignment or subletting without the consent of City Manager shall be void and constitute a default under the terms of this Lease.

4.03  Encumbrance.  Subject to prior consent by CITY, which shall not be unreasonably withheld, LESSEE may encumber this Lease, its leasehold estate and its improvements thereon by deed of trust, mortgage, chattel mortgage or other security instrument to assure the payment of a promissory note or notes of LESSEE, upon the express condition that the net proceeds of such loan or loans be devoted exclusively to the purpose of developing the leased premises in accordance with Section 6.12 Development Plan, hereof.  However, a reasonable portion of the loan proceeds may be disbursed for payment of incidental costs of construction, including but not limited to the following:  off-site improvements for service of the premises; on-site improvements; escrow charges; premiums for hazard

-15-

insurance, or other insurance or bonds required by CITY; title insurance premiums; reasonable loan costs such as discounts, interest and commissions; and architectural, engineering and attorney's fees and such other normal expenses incidental to such development.

Any subsequent encumbrances upon the Premises or on any permanent improvements thereon must first have the approval, in writing, of City Manager.  City Manager's approval shall be based upon a determination that the new loan does not exceed eighty percent (80%) of the appraised value of the leasehold estate and that operating income payable to LESSEE from the Premises are adequate to service any such debt and expenses, including rent under the terms hereof.

In the event any such approved deed of trust or mortgage or other security type instrument should at any time be in default and be foreclosed or transferred in lieu of foreclosure, CITY will accept the approved mortgagee or beneficiary thereof as its new tenant under this Lease with all the rights, privileges, and duties granted and imposed in this Lease.

Any default, foreclosure, or sale pursuant to said deed of trust, mortgage, or other security instrument shall be invalid with respect to this Lease without prior notice thereof to CITY.  Upon prior approval by CITY, said mortgagee or beneficiary may assign this Lease to its nominee, if nominee is a reputable, qualified, and financially responsible person in the opinion of CITY.  Any deed of trust, mortgage, or other security instrument shall be subject to all of the terms, covenants, and conditions of this Lease and shall not be deemed to amend or alter any of the terms, covenants, or conditions hereof.

4.04    Defaults and Remedies.

a.    Default.  In the event that:

(1)    LESSEE shall default in the performance of any covenant or condition required by this Lease to be performed by LESSEE and shall fail to cure said default within thirty (30) days following written notice thereof from CITY or if any such default is not curable within thirty (30) days, shall fail to commence to cure the default(s) within said thirty (30) day period and diligently pursue such cure to completion; or

-16-

(2) LESSEE shall voluntarily file or have involuntarily filed against it any petition under any bankruptcy or insolvency act or law; or

(3) LESSEE shall be adjudicated a bankrupt; or

(4) LESSEE shall make a general assignment for the benefit of creditors;

then CITY may, at its option, without further notice or demand upon LESSEE or upon any person claiming rights through LESSEE, immediately terminate this Lease and all rights of LESSEE and of all persons claiming rights through LESSEE to the premises or to possession thereof; and CITY may enter and take possession of the premises. Provided, however, in the event that any default described herein is not curable within thirty (30) days after notice to LESSEE, CITY shall not terminate this Lease pursuant to the default if LESSEE commences curative action within said 30-day period and thereafter diligently pursues such cure to completion.

In the event that there is a deed of trust or mortgage on the leasehold interest, CITY shall give the mortgagee or beneficiary written notice of the default(s) complained of, and the same mortgagee or beneficiary shall have thirty (30) days from such notice to cure the default(s) or, if any such default is not curable within thirty (30) days, to commence to cure the default(s) and diligently pursue such cure to completion. The thirty-day period may be extended during such time as mortgagee or beneficiary pursues said cure with reasonable diligence.

b. Remedies. If the mortgagee or beneficiary shall be required to exercise its right to cure said default(s) through litigation or through foreclosure, then CITY shall have the option of the following courses of action in order that the default(s) may be expeditiously corrected:

(1) CITY may correct said default(s) and charge the costs thereof to the account of LESSEE, which charge shall be due and payable on the date that the rent is next due after presentation by CITY to LESSEE and mortgagee or beneficiary of a statement of said costs.

(2) CITY may correct said default(s) and may pay the costs thereof from the proceeds of any insurance fund held by CITY, CITY and LESSEE or by CITY and

-17-

mortgagee or beneficiary, or CITY may use the funds of any faithful performance or cash bond on deposit with CITY, or CITY may call on the bonding agent to correct the default(s) or to pay the costs of correction performed by or at the direction of CITY.

(3) CITY may terminate this Lease as to the rights of LESSEE by assuming or causing the assumption of liability for any trust deed or mortgage. LESSEE agrees to assume and pay any and all penalties or bonuses required by the beneficiaries, trustees or mortgagees as a condition for early payoff of the related obligations by CITY. CITY may, as an alternative, substitute for the terminated LESSEE a new LESSEE reasonably satisfactory to the mortgagee or beneficiary. Any reasonable costs incurred by CITY in releasing to a new tenant shall be the responsibility of the terminated LESSEE, and LESSEE hereby agrees to reimburse CITY for any such costs.

Should the default(s) be noncurable by LESSEE, then any lender holding a beneficial interest in the leasehold, whose qualifications as an assignee have been approved by CITY, shall have the absolute right to substitute itself to the estate of LESSEE hereunder and to commence performance of this Lease. If such mortgagee or beneficiary shall give notice in writing of its election to so substitute itself within the thirty-day period after receiving written notice by CITY of the default, and the default, if curable, is cured by such mortgagee or beneficiary, then this Lease shall not terminate pursuant to the default. In that event, CITY expressly consents to the substitution and authorizes the mortgagee or beneficiary to perform under this Lease with all the rights, privileges, and obligations of LESSEE, subject to cure of the default, if possible, by mortgagee or beneficiary. LESSEE expressly agrees to assign all its interest in and to its leasehold estate to mortgagee or beneficiary in that event.

c. <u>Abandonment by LESSEE</u>. Even though LESSEE has breached the Lease and abandoned the property, this Lease shall continue in effect for so long as CITY does not terminate this Lease, and CITY may enforce all its rights and remedies hereunder, including but not limited to the right to recover the rent as it becomes due, plus damages.

d. <u>Waiver</u>. Any CITY waiver of a default is not a waiver of any other default. Any waiver of a default must be in writing and be executed by the City Manager in order to

constitute a valid and binding waiver.  CITY delay or
failure to exercise a remedy or right is not a waiver of
that or any other remedy or right under this Lease.  The
use of one remedy or right for any default does not waive
the use of another remedy or right for the same default
or for another or later default.  CITY'S acceptance of
any rents is not a waiver of any default preceding the
rent payment.  CITY and LESSEE specifically agree that
the property constituting the premises is CITY-owned and
held in trust for the benefit of the citizens of the City
of San Diego and that any failure by the City Manager or
CITY staff to discover a default or take prompt action to
require the cure of any default shall not result in an
equitable estoppal, but CITY shall at all times, subject
to applicable statute of limitations, have the legal
right to require the cure of any default when and as such
defaults are discovered or when and as the City Council
directs the City Manager to take action or require the
cure of any default after such default is brought to the
attention of the City Council by the City Manager or by
any concerned citizen.

4.05   Eminent Domain.  If all or part of the Premises is taken
through condemnation proceedings or under threat of condemna-
tion by any public authority with the power of eminent domain
other than by the CITY, the interests of the CITY, LESSEE and
beneficiary or mortgagee under any mortgage or deed of trust
will be as follows:

a.   In the event the entire Premises are taken, this Lease
shall terminate on the date of the transfer of title or
possession to the condemning authority, whichever first
occurs.

b.   In the event of a partial taking, if the remaining part
of the Premises is unsuitable for the Lease operation,
this Lease shall terminate on the date of the transfer of
title or possession to the condemning authority, which-
ever first occurs.

c.   In the event of a partial taking, if the remainder of the
Premises is suitable for continued Lease operation, as
determined by LESSEE, this Lease shall terminate in
regard to the portion taken on the date of the transfer
of title or possession of the condemning authority,
whichever occurs first, but shall continue for the
portion not taken.  The minimum rent shall be equitably
reduced to reflect the portion of the Premises taken.

-19-

constitute a valid and binding waiver. CITY delay or failure to exercise a remedy or right is not a waiver of that or any other remedy or right under this Lease. The use of one remedy or right for any default does not waive the use of another remedy or right for the same default or for another or later default. CITY'S acceptance of any rents is not a waiver of any default preceding the rent payment. CITY and LESSEE specifically agree that the property constituting the premises is CITY-owned and held in trust for the benefit of the citizens of the City of San Diego and that any failure by the City Manager or CITY staff to discover a default or take prompt action to require the cure of any default shall not result in an equitable estoppal, but CITY shall at all times, subject to applicable statute of limitations, have the legal right to require the cure of any default when and as such defaults are discovered or when and as the City Council directs the City Manager to take action or require the cure of any default after such default is brought to the attention of the City Council by the City Manager or by any concerned citizen.

4.05   Eminent Domain. If all or part of the Premises is taken through condemnation proceedings or under threat of condemnation by any public authority with the power of eminent domain other than by the CITY, the interests of the CITY, LESSEE and beneficiary or mortgagee under any mortgage or deed of trust will be as follows:

a.   In the event the entire Premises are taken, this Lease shall terminate on the date of the transfer of title or possession to the condemning authority, whichever first occurs.

b.   In the event of a partial taking, if the remaining part of the Premises is unsuitable for the Lease operation, this Lease shall terminate on the date of the transfer of title or possession to the condemning authority, which-ever first occurs.

c.   In the event of a partial taking, if the remainder of the Premises is suitable for continued Lease operation, as determined by LESSEE, this Lease shall terminate in regard to the portion taken on the date of the transfer of title or possession of the condemning authority, whichever occurs first, but shall continue for the portion not taken. The minimum rent shall be equitably reduced to reflect the portion of the Premises taken.

-19-

    d.    Award. Subject to the rights of any mortgagee, all monies awarded in any such taking shall belong to CITY to the extent of its reversionary interest in land and improvements. Any diminution in value of the Leasehold shall be awarded to LESSEE. CITY shall have no liability to LESSEE for any award not provided by the condemning authority.

    e.    Transfer. CITY has the right to transfer the CITY'S interests in the Premises, in lieu of condemnation, to any authority entitled to exercise the power of eminent domain. If a transfer occurs, the LESSEE shall retain its possessory interest in the fair market value of its leasehold interest.

    f.    No Inverse Condemnation. The exercise of any CITY right under this Lease shall not be interpreted as an exercise of the power of eminent domain and shall not impose any liability upon CITY for inverse condemnation.

4.06    Partnership Liability. Each general partner of LESSEE shall jointly and severally perform and be responsible for each and every term, covenant and condition and each general partner is jointly and severally liable for performance under this Lease.

## SECTION 5:    INSURANCE RISKS/SECURITY

5.01    Indemnity. LESSEE at all times following the Commencement Date shall relieve, indemnify, protect and save CITY and any and all of its boards, officers, agents and employees harmless from any and all claims and demands, actions, proceedings, losses, liens, costs, judgments, civil fines and penalties of any nature whatsoever in regard to or resulting from the use of the Premises, including, but not limited to, expenses incurred in legal actions, death, injury or damage that may be caused directly or indirectly by:

    a.    Any unsafe or defective condition in or on the Premises, which may exist by reason of any act, omission, neglect, or any use or occupation of the Premises by LESSEE;

    b.    Any operation, use or occupation conducted on the Premises;

    c.    Any act, omission or negligence on the part of LESSEE, its employees, agents, sublessees, invitees, licensees; or

d.  Any failure by LESSEE to comply or secure compliance with any of the Lease terms or conditions.

Said indemnification by LESSEE to CITY shall not extend to any act, omission or negligence on the part of CITY, its employees, agents, boards and officers.

5.02   Insurance.  LESSEE shall take out and maintain at all times during the term of this Lease following the Commencement Date the following insurance at its sole expense:

a.  Public Liability and property damage insurance in the amount of not less than TWO MILLION DOLLARS ($2,000,000) COMBINED SINGLE LIMIT LIABILITY.  This policy shall cover all injury or damage, including death, suffered by any party or parties, from acts or failures to act by CITY or LESSEE or by authorized representatives of CITY or LESSEE, on or in connection with the use or operation of the Premises.

b.  Fire, extended coverage and vandalism insurance policy on all insurable property on the Premises, with a full replacement cost endorsement.  Any proceeds from a loss shall be payable jointly to the CITY and LESSEE.  The proceeds shall be placed in a trust fund to be reinvested in rebuilding or repairing the damaged property.  If there is a mortgage or trust deed on the leasehold in accordance with the Encumbrance section hereof, the proceeds may be paid to the approved mortgagee or benefi-ciary so long as adequate provision reasonably satisfac-tory to CITY has been made in each case for the use of all proceeds for repair and restoration of damaged or destroyed improvements on the Premises.

c.  Conditions.  All insurance policies will name the CITY as an additional insured, protect the CITY against any legal costs in defending claims and will not terminate without thirty (30) days prior written notice to the CITY.  All insurance companies must be satisfactory to the CITY, which approval will not be unreasonably withheld, and licensed to do business in California.  All policies will be in effect on or before the first day of the Lease, except "course of construction fire insurance" shall be in force on commencement of all authorized construction on the Premises and full applicable Fire Insurance coverage shall be effective upon completion of each insurable improvement.  A copy of the insurance certifi-cate will remain on file with CITY during the entire term of the Lease.  At least thirty (30) days prior to the expiration of each policy, LESSEE shall furnish a

-21-

certificate(s) showing that a new or extended policy has been obtained which meets the terms of this Lease.

d.  <u>Modification</u>.  CITY, at its discretion, may require the revision of amounts and coverages at any time during the term by giving LESSEE sixty (60) days prior written notice.  CITY'S requirements shall be designed to assure protection from and against the kind and extent of risk existing on the Premises.  LESSEE also agrees to acquire any additional insurance required by CITY for new improvements, in order to meet the requirements of this Lease.  Any such amounts shall not exceed the cost of replacement in the case of fire insurance or liability limits increased by the percentage increase in the Bureau of Labor Statistics Consumer Price Index for all Urban Consumers (1967=100), All Items, for the <u>Los Angeles/Long Beach</u> Metropolitan Area ("Consumer Price Index") from the date of commencement of the term hereof.

e.  <u>Accident Reports</u>.  LESSEE shall report to CITY any accident causing more than Ten Thousand Dollars ($10,000), increased by any increase in the Consumer Price Index, worth of property damage or any serious injury to persons on the Premises.  This report should contain the names and addresses of the parties involved, a statement of the circumstances, the date and hour, the names and addresses of any witnesses and other pertinent information.

f.  <u>Failure to Comply</u>.  If LESSEE fails or refuses to take out and maintain the required insurance, or fails to provide the proof of coverage, CITY has the right to obtain the insurance.  LESSEE shall reimburse CITY for the premiums paid with interest at the maximum allowable legal rate then in effect in California.  CITY shall give thirty (30) days written notice of any failure to obtain insurance and, if not cured, the payment of premiums within thirty (30) days of payment stating the amount paid, names of the insurer or insurers and rate of interest.  Said reimbursement and interest shall be paid by LESSEE on the first (1st) day of the month following the notice of payment by CITY.

Notwithstanding the preceding provisions of this subsection f., if LESSEE fails or refuses to take out or maintain insurance as required in this Lease, or fails to provide the proof of insurance, within <u>fifteen (15)</u> days after written notice, CITY has the right to declare this Lease in default without further notice to LESSEE and CITY shall be entitled to exercise all legal remedies in the event of such default.

-22-

5.03    Waste, Damage or Destruction. LESSEE agrees to give notice to the CITY of any fire damage or other damage that may occur on the Premises within ten (10) days of such fire or damage. LESSEE agrees not to commit and to seek to prevent any waste or injury or any public or private nuisance, to keep the Premises clean and clear of refuse and obstructions, and to dispose of all garbage, trash and rubbish in a manner reasonably satisfactory to the CITY. If the Premises shall be damaged by any cause which puts the Premises into a condition which is not decent, safe, healthy and sanitary, LESSEE agrees to make or cause to be made full repair of said damage and to restore the Premises to the condition which existed prior to said damage, or, at the CITY'S option, LESSEE agrees to clear and remove from the Premises all debris resulting from said damage and rebuild the Premises in accordance with plans and specifications previously submitted to the CITY and approved in writing in order to replace in kind and scope the operation which existed prior to such damage using for either purpose the insurance proceeds as set forth in Section 5.02 Insurance, hereof.

LESSEE agrees that preliminary steps toward performing repairs, restoration or replacement of the Premises shall be commenced by LESSEE within thirty (30) days and the required repairs, restoration or replacement shall be completed within a reasonable time thereafter. CITY shall determine an equitable deduction in the minimum annual rent requirement for such period or periods that said Premises are untenantable by reason of such damage. City's determination of the amount of the deduction shall be based upon that proportion shall be based upon that portion of the buildings on the Premises which remain tenantable taking into account the condition of subtenants premises, reasonable access to such spaces and available parking.

5.04    Security Deposit. A security deposit shall be paid to the CITY by LESSEE in the sum of Twenty Thousand Dollars ($20,000) on or before the commencement date of this lease. All or any portion of the principal sum shall be available unconditionally to CITY for correcting any default or breach of this lease by LESSEE, LESSEE'S successors or assigns, or for payment of expenses incurred by CITY as a result of LESSEE'S failure to faithfully perform all terms, covenants and conditions of this lease.

The security deposit shall take one of the forms set out below:

    a.    Cash. Cash deposits shall be deposited with CITY and CITY shall not be liable to LESSEE for any interest

-23-

thereon.  Provided further, any interest earned by CITY
from such deposit or redeposit shall be and remain the
property of CITY.

b.   Instrument(s) of Credit.  An instrument(s) of credit from
one or more financial institutions, subject to regulation
and insurance by the state or federal government, shall
pledge that the funds are on deposit and guaranteed for
payment, and agree that any or all funds shall be paid to
CITY upon demand by CITY.

The financial institution and the form of any instrument
pledging the funds must be approved by CITY.

In the event CITY utilizes all or any portion of the security
deposit, LESSEE shall reimburse the deposit within ten (10)
days of notice from CITY to bring the security deposit up to
the full specified amount.

The security or any balance thereof will be returned to LESSEE
within ninety (90) days following one year after the receipt
of a Certificate of Payment with respect to the Premises, of
this lease, provided LESSEE has faithfully complied with all
terms, covenants and conditions hereof.

The security deposit may be increased by CITY proportionate to
any increased performance or rental liability of LESSEE upon
sixty (60) days' prior written notice from CITY of such
required increase.

SECTION 6:    IMPROVEMENTS/ALTERATIONS/REPAIRS

6.01   Acceptance of Premises.  By signing this Lease, LESSEE repre-
sents and warrants that it has independently inspected the
Premises and made all tests, investigations and observations
necessary to satisfy itself of the condition of the Premises.
LESSEE agrees it is relying solely on such independent inspec-
tion, tests, investigations and observations in making this
Lease.  LESSEE further acknowledges that Premises are in the
condition called for by this Lease, that CITY has performed
all work with respect to the Premises and that LESSEE does not
hold CITY responsible for any defects in the Premises.

6.02   Entry and Inspection.  CITY reserves and shall always have the
right to enter said Premises during normal business hours for
the purpose of viewing and ascertaining the condition of the
same, or to protect its interests in the Premises or to
inspect the operations conducted thereon.  In the event that
such entry or inspection by CITY discloses that said Premises

-24-

are not in a decent, safe, healthy and sanitary condition, CITY shall have the right, after fifteen (15) days written notice to LESSEE, and LESSEE'S failure to cure same, to have any necessary maintenance work done for and at the expense of LESSEE and LESSEE hereby agrees to pay promptly any and all costs incurred by CITY in having such necessary maintenance work done in order to keep said Premises in a decent, safe, healthy and sanitary condition. Further, if at any time the CITY determines that said Premises are not in a decent, safe, healthy and sanitary condition, within fifteen (15) days after written notice to LESSEE, CITY may at its sole option, without additional notice, require LESSEE to file with CITY to correct the said unsatisfactory condition. LESSEE shall pay the cost of said bond. The rights reserved in this section shall not create any obligations on CITY or increase obligations elsewhere in this Lease imposed on CITY. Notwithstanding anything set forth hereinabove, CITY shall not commence curative action of any repair or require a bond if LESSEE has commenced to cure the noticed problem within said fifteen (15) day period and diligently pursues any necessary work to completion.

6.03    Maintenance.  LESSEE agrees to assume full responsibility and cost for the operation and maintenance of the premises throughout the term. LESSEE will make all repairs and replacements necessary to maintain and preserve the premises in a decent, safe, healthy, and sanitary condition satisfactory to CITY and in compliance with the Development Plan described in Section 6.12 Development Plan, hereof, and with all applicable laws.

Notwithstanding the foregoing, LESSEE shall not be responsible to repair or replace water, gas, electric, sewer or other public utilities existing or installed by the CITY on the Premises, except for laterals and services which provide utilities to the Premises which would be the usual responsibility of the occupant of such building under the terms of any respective agreement with the provider of such services, and except for repairs necessitated by or resulting from the activities of LESSEE, its sublessees, agents and licensees.

6.04    Improvements/Alterations.  Except as approved in the Development Plan, no improvements, constructions or installations shall be constructed on the Premises without the prior written consent of City Manager, which approval shall not be unreasonably withheld. City Manager hereby approves any alterations or repairs which do not alter the appearance of the exterior of the buildings as set forth in the Development Plan. Similarly, the City Manager hereby approves any interior improvements which do not alter such approved exterior elevations or affect the structural integrity of the premises.

-25-

This provision shall not relieve LESSEE of any obligation under this Lease to maintain the premises in a decent, safe, healthy, and sanitary condition, including the structural repair and restoration of damaged or worn improvements. CITY shall not be obligated by this Lease to make or assume any expense for any improvements or alterations.

6.05    Utilities. LESSEE agrees to order, obtain and pay for all utilities and service and installation charges on the Premises in connection with the development and operation of the Premises. All utilities will be installed underground.

6.06    Construction Bond. Whenever there is any construction to be performed related to public improvements on the Premises, LESSEE shall deposit with CITY, prior to commencement of said construction a faithful performance bond in the amount of one hundred percent (100%) of the estimated construction cost of the public improvement work to be performed. The bond may be in cash or may be a corporate surety bond or other security satisfactory to CITY. The bond shall insure that the construction commenced by LESSEE shall be completed in accordance with the plans approved by CITY or, at the option of CITY, that the uncompleted construction shall be removed and the Premises restored to a condition satisfactory to CITY. The bond or cash will be held in trust by CITY for the purpose specified above or at CITY'S option it may be placed in an escrow or other trust approved by CITY. With regard to the other improvements, LESSEE shall provide to City Manager evidence of adequate financing to assume completion of same and appropriate fund control provisions to insure such funds will be utilized for the completion of said improvements.

6.07    Liens. LESSEE will at all times save CITY free and harmless and indemnify CITY against all claims for labor or materials in connection with operations, improvements, alterations or repairs on or to the Premises, and the costs of defending against such claims, including reasonable attorney's fees.

If improvements, alterations or repairs are made to the Premises by LESSEE or by any party other than CITY and a lien or notice of lien is filed, LESSEE shall within ten (10) days of such filing either:

a.    Take all actions necessary to record a valid release of lien, or

b.    File with CITY a bond, cash, or other security acceptable to CITY, sufficient to pay in full al claims of all persons seeking relief under the lien.

-26-

6.08   <u>Taxes</u>.  LESSEE agrees to pay, before delinquency, all taxes, assessments and fees assessed or levied upon LESSEE or the Premises including the land, any buildings, structures, machines, equipment, appliances or other improvements or property of any nature whatsoever, erected, installed or maintained by LESSEE or any sublessee or levied by reason of the business or other LESSEE or sublessee activities related to the Premises, including any licenses or permits.  If this Lease creates a possessory interest subject to the payment of taxes levied on such interest, LESSEE shall pay all such possessory interest taxes.

LESSEE further agrees that payment for such taxes, fees and assessments will not reduce any rent due the CITY.

6.09   <u>Signs</u>.  LESSEE agrees not to erect or display any banners, pennants, flags, posters, signs, decorations, marquees, awnings, or similar devices or advertising without the prior written consent of CITY which consent shall not unreasonably withheld.  If any such unauthorized item is found on the premises, LESSEE agrees to remove the item at its expense within 72 hours notice thereof by CITY, or CITY may thereupon remove the item at LESSEE'S cost.  The City Manager agrees to assist LESSEE in obtaining approvals for on and off-site signage.

6.10   <u>Ownership of Improvements</u>

a.   All and any improvements, trade fixtures, structures and installations or additions to the Premises now existing or constructed on the Premises by LESSEE, shall at Lease expiration or termination, be deemed to be part of the Premises and shall become at CITY'S option the CITY'S property, free of all liens and claims except as otherwise provided in this Lease.

b.   If the CITY elects not to assume ownership of all or any improvements, trade fixtures, structures and installation, and CITY notifies LESSEE 30 days prior to termination or 180 days prior to expiration, LESSEE shall remove all such any commercial improvements, structures and installations as directed by the CITY at LESSEE'S sole cost on or before Lease expiration or termination.  If the LESSEE fails to remove any improvements, structures and installations as directed, the LESSEE agrees to pay CITY the full cost of any removal.

c.   LESSEE-owned machines, appliances, equipment (other than trade fixtures) and other items of personal property shall be removed by LESSEE by the date of the expiration

-27-

or termination of this Lease.  Any said items which LESSEE fails to remove will be considered abandoned and become the CITY'S property free of all claims and liens, or CITY may at its option remove said items at LESSEE'S expense.

d.   If any removal of such personal property by LESSEE results in damage to the remaining improvements on the Premises, LESSEE agrees to repair all such damage, reasonable wear and tear excepted.

e.   Any necessary removal by either CITY or LESSEE which takes place beyond said expiration or termination hereof shall require rental by LESSEE to CITY at the rate in effect immediately prior to said expiration or termination.

f.   Notwithstanding any of the foregoing, in the event LESSEE desires to dispose of any of its personal property used in the operation of the Premises upon expiration or termination of this Lease, then CITY shall have the first right to acquire or purchase said personal property.

6.11   Unavoidable Delay.  If the performance of any act required of CITY or LESSEE is directly prevented or delayed by reason of strikes, lockouts, labor disputes, unusual governmental delays, delays resulting from legal actions brought against CITY or LESSEE in connection with the rights or obligation hereunder, acts of God, fire, floods, epidemics, freight embargoes or other causes beyond the reasonable control of the party required to perform an act, said party shall be excused from performing that act for the period equal to the period of the prevention or delay.  In the event LESSEE or CITY claim the existence of such a delay, the party claiming the delay shall notify the other party in writing of such fact within ten (10) days after the beginning of any such claimed delay.

6.12   Development Plan.  LESSEE agrees to develop the leased premises in accordance with the Development Plan approved by the City Manager and filed in the Office of the City Clerk which plan is hereby incorporated by this reference.  The general contents and provisions of the Development Plan are described in Exhibit C, hereof.  The City Manager or his designee shall have the authority to authorize changes to the plan provided that the basic concept may not be modified without City Council approval and a document evidencing any approved changes shall be filed in the Office of the City Clerk.  Failure by LESSEE to comply with the Development Plan shall constitute a default under the terms hereof.

-28-

6.13   Failure to Meet Development Schedule.  In the event that construction of the improvements described in the Development Plan are not completed within twenty-four (24) months following the Commencement Date, CITY may, at its option, terminate this Lease.

6.14   Coastal Commission Approval.  LESSEE shall comply with the California Coastal Act, at its sole cost, and apply to the San Diego Coast Regional Commission or other such authorized State body for any necessary coastal development permit authorizing the construction of improvements in the Coastal Zone.  LESSEE will proceed with diligence to obtain such permit, but if LESSEE is unable to do so within twelve (12) months after the date effective hereof, subject to extension pursuant to Section 6.1I, because of the failure of LESSEE to diligently pursue same, this Lease may be terminated by CITY.

SECTION 7:   GENERAL PROVISIONS

7.01   Notices.

a.   Any notice required or permitted to be given hereunder shall be in writing and may be served personally or by United States mail, postage prepaid, addressed to LESSEE at 3838 Camino del Rio North, Suite 301, San Diego, CA 92108, with a copy to MacHutchin Development, 7458 La Jolla Blvd., La Jolla, CA 92037 and a copy to Paul Thoryk, Inc., 1157 Columbia Street, San Diego, California 92101, or at such other address designated in writing by LESSEE; and to CITY as follows:

         City Manager, Attention Property Director
         City Administration Building
         202 C Street, M. S. 9B
         San Diego, CA  92101-4155

and to any mortgagee, trustee or beneficiary, as applicable at such appropriate address designated in writing by the respective party.

b.   Any party entitled or required to receive notice under this Lease may by like notice designate a different address to which notices shall be sent.

7.02   Compliance with Law.  LESSEE will at all times in the construction, maintenance, occupancy and operation of the Premises, comply with all applicable laws, statues, ordinances and regulations of the CITY, County, State and Federal Government, at LESSEE'S sole cost and expense.  In addition,

-29-

LESSEE will comply with any and all notices issued by the City Manager or his authorized representative under the authority of any such law, statute, ordinance, or regulation.

7.03   CITY Approval.  The approval or consent of the CITY, wherever required in this Lease, shall mean the written approval or consent of the City Manager unless otherwise specified, without need for further resolution by the City Council, which approval shall not be unreasonably withheld.

7.04   Nondiscrimination.  LESSEE agrees not to discriminate in any manner against any person or persons on account of race, marital status, sex, religious creed, color, ancestry, national origin, age or physical handicap in the use by LESSEE of the Premises, including, but not limited to, the providing of goods, services, facilities, privileges, advantages and accommodations, and the obtaining and holding of employment.

7.05   Equal Opportunity.  LESSEE agrees to abide by the Equal Opportunity Program for non-construction contractors doing business with the CITY.  A copy of the program effective as of the date of this Lease is on file in the City Clerk's Office as Document RR262633, and by this reference is part hereof. The program's goal is the attainment of employment for minorities and women in all areas of employment, in a total percentage as established by the CITY for its Equal Opportunity Program each year.

7.06   Partial Invalidity.  If any term, covenant, condition or provision of this Lease is found invalid, void or unenforceable by a court of competent jurisdiction, the remaining provisions will remain in full force and effect.

7.07   Legal Fees.  In the event of any litigation regarding this Lease, the prevailing party shall be entitled to an award of reasonable legal costs, including court costs and attorney's fees.

7.08   Number and Gender.  Words of any gender used in this Lease shall include any other gender, and words in the singular number shall include the plural, when the tense requires.

7.09   Captions.  The Lease Table of Contents, section headings and captions for various articles and paragraphs shall not be held to define, limit, augment or describe the scope, content or intent of any or all parts of this Lease.  The numbers of the paragraphs and pages of this Lease.  The numbers of the paragraphs and pages of this Lease may not be consecutive.  Such lack of consecutive numbers is intentional and shall have no effect on the enforceability of this Lease.

-30-

7.10  Entire Understanding.  This Lease contains the entire under-standing of the parties.  LESSEE, by signing this agreement, agrees that there is no other written or oral understanding between the parties in respect to the Premises.  Notwith-standing the foregoing, LESSEE and CITY agree to execute amendments reasonably requested by any mortgagee which (i) do not impact the amounts payable hereunder and (ii) are reason-ably required to provide any such mortgagee with notice of any defaults by LESSEE hereunder and the reasonable opportunity to cure same.  Each party has relied on its own examination of the Premises, advise from its own attorneys and the warran-ties, representations and covenants of the Lease.  Each of the parties to this Lease agrees that no other party, agent or attorney of any other party has made any promise, representa-tion or warranty whatsoever, which is not contained in this Lease.

The failure or refusal of any party to read the Lease or other documents, inspect the Premises and obtain legal or other advice relevant to this transaction, constitutes a waiver of any objection, contention or claim that might have been based on these actions.  No modification, amendment or alteration of this Lease will be valid unless it is in writing and signed by all parties.

7.11  Partnership Authority.  Each individual executing this Lease on behalf of LESSEE represents and warrants that he is duly authorized to execute and deliver this Lease on behalf of said partnership, and that this Lease is binding upon the partner-ship in accordance with its terms and that the LESSEE is a duly qualified partnership and all steps have been taken prior to the date hereof to qualify LESSEE to do business in the state where the Premises are situated.

7.12  Standard of Employees.  The LESSEE and its employees shall at all times conduct themselves and the operations on the leased premises in a creditable manner.

7.13  Right of First Refusal.  Upon the expiration of this Lease, and upon the condition that the LESSEE has fully complied with the terms and conditions of this Lease during the Lease term, or cured any monetary breaches within fifteen (15) days after notice hereof and non-monetary breaches within a reasonable time after notice thereof, CITY agrees that LESSEE shall have the right of first refusal to enter into a new Lease for the Premises upon such terms and conditions as are determined appropriate in the sole discretion of the City Council.  The right of first refusal shall be contingent upon a finding by the City Council that it is desirable and in the public's best interest to continue the uses of the property as specified in

this Lease.  In the event the CITY determines to utilize the Premises for other uses, the LESSEE shall not have a right of first refusal.  If the CITY does determine to continue to Lease the Premises for the uses approved under this Lease, CITY shall advise LESSEE of proposed terms and conditions at least one year prior to the expiration of the initial term hereof.  In the event LESSEE and CITY are unable to agree upon terms and conditions within one hundred eighty (180) days after said notice to LESSEE, CITY may Lease the property to another party so long as the Lease contains substantially the same terms and conditions as were rejected by LESSEE.  In any event, any and all rights of first refusal shall expire two years following the expiration of this Lease in the event CITY and LESSEE have not entered into a new Lease of the Premises.

7.14   Roller Coaster Lease.  CITY acknowledges that the restoration and maintenance of the adjacent Roller Coaster property is necessary for LESSEE to undertake and operate the Premises in a professional and economically feasible manner.  LESSEE is aware of the terms of the existing Roller Coaster Lease.  CITY agrees to enforce the provisions of the Roller Coaster Lease in a reasonable manner.  Upon expiration or earlier termination of the Roller Coaster Lease, LESSEE shall have the right of first refusal to take over the remaining Lease term or enter into a new Lease under the terms as set forth above relating to a right of first refusal of the Premises.

SECTION 8:   SIGNATURES

IN WITNESS WHEREOF, this Lease Agreement is executed by CITY, acting by
and through its City Manager, and by LESSEE, acting by and through its
lawfully authorized officers.

THE CITY OF SAN DIEGO

Date: _3-4-87_          By: _____
                            ~~Deputy~~ City Manager
                            _Asst_

BELMONT PARK ASSOCIATES, a California
limited partnership

PHASE ONE DEVELOPMENT, INC.

By: _____
    Steven L. Davis, President


SEAPARK ASSOCIATES, a California
limited partnership

MacHUTCHIN DEVELOPMENT, General
Partner

By: _____
    Graham J. MacHutchin, President


PAUL THORYK, INC.

By: _____
    Paul Thoryk, President

APPROVED as to form and legality this _5_ day of _March_, 19_87_.

By: _____
    City Attorney

-33-

EXHIBIT "A"



EXHIBIT "A"

LEGAL DESCRIPTIONS

PARCEL A:

THAT CERTAIN REAL PROPERTY IN PUEBLO LOT 1803 OF THE PUEBLO LANDS OF SAN DIEGO, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 1809 FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, NOVEMBER 13, 1924, BEING A PORTION OF THE UNNUMBERED TRACT LYING BETWEEN THE NORTHERLY LINE OF SAN FERNANDO PLACE AND THE SOUTHERLY LINE OF VENTURA PLACE, AS SHOWN ON SAID MAP, DESCRIBED IN AS FOLLOWS:

BEGINNING AT A POINT IN THE WEST LINE OF WEST DRIVE OF MISSION BOULEVARD, AS DESCRIBED IN DEED FROM MISSION BEACH COMPANY TO THE CITY OF SAN DIEGO RECORDED MARCH 6, 1924 IN BOOK 999, PAGE 64 OF DEEDS, FILED IN SAID COUNTY RECORDER'S OFFICE, WHICH POINT BEARS SOUTH 23°40'05" EAST A DISTANCE OF 852.23 FEET FROM THE SOUTHWEST CORNER OF BLOCK 96 OF MISSION BEACH AS SHOWN ON SAID MAP NO. 1809, SAID POINT ALSO BEING THE INTERSECTION OF THE NORTH LINE OF PRADO WITH SAID WEST LINE OF WEST DRIVE OF MISSION BOULEVARD; THENCE SOUTHERLY 10.00 FEET, MORE OR LESS, TO A POINT ON THE WEST LINE OF SAID WEST DRIVE OF MISSION BOULEVARD; THENCE SOUTH 89°12'00" WEST, 406.00 FEET, MORE OR LESS, TO THE EASTERLY LINE OF THE BOARDWALK WHICH LIES 24 FEET EAST OF THE SEAWALL; THENCE NORTHERLY ALONG THE EASTERLY LINE OF SAID BOARDWALK A DISTANCE OF 550.00 FEET, MORE OR LESS; THENCE LEAVING THE EASTERLY LINE OF SAID BOARDWALK PERPENDICULAR AND EASTERLY 75.00 FEET, MORE OR LESS; THENCE PERPENDICULAR AND NORTHERLY 53.00 FEET, MORE OR LESS; THENCE PERPENDICULAR AND EASTERLY 20.00 FEET, MORE OR LESS; THENCE PERPENDICULAR AND NORTHERLY 45.00 FEET, MORE OR LESS; THENCE PERPENDICULAR AND WESTERLY 20.00 FEET, MORE OR LESS; THENCE PERPENDICULAR AND NORTHERLY TO THE SOUTHERLY LINE OF VENTURA PLACE; THENCE NORTH 89°12'00" EAST ALONG THE SOUTHERLY LINE OF VENTURA PLACE TO THE INTERSECTION OF SAID COURSE WITH THE WEST LINE OF WEST DRIVE OF MISSION BOULEVARD, ABOVE REFERENCED; THENCE SOUTHERLY ALONG SAID WEST LINE OF WEST DRIVE OF MISSION BOULEVARD TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM ANY PORTION LYING EASTERLY OF THE WEST LINE OF MISSION BOULEVARD AS SAID BOULEVARD IS DESCRIBED IN DEED FROM MISSION BEACH COMPANY TO THE CITY OF SAN DIEGO RECORDED SEPTEMBER 13, 1940 IN BOOK 1077, PAGE 116 OF OFFICIAL RECORDS AS NAMED AND DEDICATED BY RESOLUTION NO. 72228 OF THE CITY COUNCIL OF THE CITY OF SAN DIEGO AND ADOPTED SEPTEMBER 10, 1940.

ALSO EXCEPTING THEREFROM ANY PORTION, IF ANY LYING BELOW THE MEAN HIGH TIDE OF THE PACIFIC OCEAN.



ALSO EXCEPTING THE FOLLOWING DESCRIBED PROPERTY:

BEGINNING AT THE SOUTHEASTERLY CORNER OF THAT CERTAIN PARCEL OF LAND DESCRIBED AS PARCEL 2 IN THE DEED FROM THE MISSION BEACH COMPANY TO THE SAN DIEGO ELECTRIC RAILWAY COMPANY, DATED FEBRUARY 14, 1942, AND RECORDED FEBRUARY 20, 1942 IN BOOK 1301, PAGE 478 OF OFFICIAL RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY; THENCE ALONG THE WESTERLY LINE OF MISSION BOULEVARD NORTH 02°48'00" WEST, 29.67 FEET TO THE BEGINNING OF A CURVE TO THE LEFT WHICH IS CONCAVE TO THE WEST AND HAS A RADIUS OF 1980.00 FEET; THENCE TANGENT TO SAID LAST DESCRIBED COURSE ALONG THE ARC OF SAID CURVE THROUGH AN ANGLE OF 06°30'00" A DISTANCE OF 224.62 FEET TO THE END OF SAID CURVE; THENCE CONTINUING ALONG SAID WESTERLY LINE OF MISSION BOULEVARD AND TANGENT TO SAID LAST CURVE, NORTH 9°18'00" WEST 88.82 FEET; TO THE TRUE POINT OF BEGINNING; THENCE NORTH 59°45'00" WEST, 12.75 FEET; THENCE SOUTH 14°05'00" WEST, 66.25 FEET; THENCE SOUTH 32°45'00" WEST 5.47 FEET TO THE BEGINNING OF A CURVE TO THE LEFT WHICH IS CONCAVE TO THE SOUTHEAST AND HAS A RADIUS OF 360.00 FEET, MORE OR LESS; THENCE TANGENT TO SAID LAST DESCRIBED COURSE ALONG THE ARC OF SAID CURVE THROUGH AN ANGLE OF 33°33'00" A DISTANCE OF 210.80 FEET, MORE OR LESS, TO THE END OF SAID CURVE; THENCE SOUTH 00°48'00" EAST, 178.45 FEET; THENCE SOUTH 89°12'00" WEST, 92.50 FEET; THENCE NORTH 00°48'00' WEST, 235.00 FEET; THENCE SOUTH 89°12'00"WEST, 8.00 FEET; THENCE NORTH 00°48'00" WEST, 40.00 FEET; THENCE NORTH 44°12'00" EAST, 94.75 FEET; THENCE NORTH 00°48'00" WEST, 25.00 FEET; THENCE NORTH 89°12'00" EAST, 8.00 FEET; THENCE NORTH 00°48'00" WEST, 117.00 FEET; THENCE NORTH 89°12'00" EAST, 48.00 FEET; THENCE NORTH 00°48'00" WEST, 23.00 FEET; THENCE NORTH 69°00'00" WEST, 56.54 FEET TO THE SOUTHERLY LINE OF VENTURA PLACE; THENCE ALONG SAID SOUTHERLY LINE NORTH 89°12'00" EAST, 105.00 FEET TO THE INTERSECTION OF SAID COURSE WITH THE WEST LINE OF WEST DRIVE OF MISSION BOULEVARD; THENCE SOUTH 11°00'00" EAST, 90.00 FEET TO THE TRUE POINT OF BEGINNING.

PARCEL B:

THAT PORTION OF PUEBLO LOT 1803 OF THE PUEBLO LANDS OF SAN DIEGO, IN THE CITY OF SAN DIEGO, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO THE MAP THEREOF MADE BY JAMES PASCOE, A COPY OF WHICH MAP IS FILED AS MISCELLANEOUS MAP NO. 36 IN THE OFFICE OF THE COUNTY RECORDED IN SAID SAN DIEGO COUNTY CALIFORNIA, SAID PORTION OF PUEBLO LOT 1803 BEING SHOWN ON SHEETS 3 AND 4 OF MAP NO. 1809 OF MISSION BEACH ON FILE IN THE OFFICE OF SAID COUNTY RECORDER, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ALSO EXCEPTING THE FOLLOWING DESCRIBED PROPERTY:

BEGINNING AT THE SOUTHEASTERLY CORNER OF THAT CERTAIN PARCEL OF LAND DESCRIBED AS PARCEL 2 IN THE DEED FROM THE MISSION BEACH COMPANY TO THE SAN DIEGO ELECTRIC RAILWAY COMPANY, DATED FEBRUARY 14, 1942, AND RECORDED FEBRUARY 20, 1942 IN BOOK 1301, PAGE 478 OF OFFICIAL RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY; THENCE ALONG THE WESTERLY LINE OF MISSION BOULEVARD NORTH 02°48'00" WEST, 29.67 FEET TO THE BEGINNING OF A CURVE TO THE LEFT WHICH IS CONCAVE TO THE WEST AND HAS A RADIUS OF 1980.00 FEET; THENCE TANGENT TO SAID LAST DESCRIBED COURSE ALONG THE ARC OF SAID CURVE THROUGH AN ANGLE OF 06°30'00" A DISTANCE OF 224.62 FEET TO THE END OF SAID CURVE; THENCE CONTINUING ALONG SAID WESTERLY LINE OF MISSION BOULEVARD AND TANGENT TO SAID LAST CURVE, NORTH 9°18'00" WEST 88.82 FEET; TO THE TRUE POINT OF BEGINNING; THENCE NORTH 59° 45' 00" WEST, 12.75 FEET; THENCE SOUTH 14°05'00" WEST, 66.25 FEET; THENCE SOUTH 32°45'00" WEST 5.47 FEET TO THE BEGINNING OF A CURVE TO THE LEFT WHICH IS CONCAVE TO THE SOUTHEAST AND HAS A RADIUS OF 360.00 FEET, MORE OR LESS; THENCE TANGENT TO SAID LAST DESCRIBED COURSE ALONG THE ARC OF SAID CURVE THROUGH AN ANGLE OF 33°33'00" A DISTANCE OF 210.80 FEET, MORE OR LESS, TO THE END OF SAID CURVE; THENCE SOUTH 00°48'00" EAST, 178.45 FEET; THENCE SOUTH 89°12'00" WEST, 92.50 FEET; THENCE NORTH 00°48'00' WEST, 235.00 FEET; THENCE SOUTH 89°12'00"WEST, 8.00 FEET; THENCE NORTH 00°48'00" WEST, 40.00 FEET; THENCE NORTH 44°12'00" EAST, 94.75 FEET; THENCE NORTH 00°48'00" WEST, 25.00 FEET; THENCE NORTH 89°12'00" EAST, 8.00 FEET; THENCE NORTH 00°48'00" WEST, 117.00 FEET; THENCE NORTH 89°12'00" EAST, 48.00 FEET; THENCE NORTH 00°48'00" WEST, 23.00 FEET; THENCE NORTH 69°00'00" WEST, 56.54 FEET TO THE SOUTHERLY LINE OF VENTURA PLACE; THENCE ALONG SAID SOUTHERLY LINE NORTH 89°12'00" EAST, 105.00 FEET TO THE INTERSECTION OF SAID COURSE WITH THE WEST LINE OF WEST DRIVE OF MISSION BOULEVARD; THENCE SOUTH 11°00'00" EAST, 90.00 FEET TO THE TRUE POINT OF BEGINNING.

PARCEL B:

THAT PORTION OF PUEBLO LOT 1803 OF THE PUEBLO LANDS OF SAN DIEGO, IN THE CITY OF SAN DIEGO, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO THE MAP THEREOF MADE BY JAMES PASCOE, A COPY OF WHICH MAP IS FILED AS MISCELLANEOUS MAP NO. 36 IN THE OFFICE OF THE COUNTY RECORDED IN SAID SAN DIEGO COUNTY CALIFORNIA, SAID PORTION OF PUEBLO LOT 1803 BEING SHOWN ON SHEETS 3 AND 4 OF MAP NO. 1809 OF MISSION BEACH ON FILE IN THE OFFICE OF SAID COUNTY RECORDER, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

PRADO STREET WITH THE WESTERLY LINE OF WEST ..IVE OF MISSION BOULEVARD, A PORTION OF ... C WAS VACATED AND CLOSE.. ...C PUBLIC USE BY RESOLUTION NO. 76888 OF THE COUNTY OF THE CITY OF ...N DIEGO ADOPTED MAY 12, 1942, SAID POINT OF BEGINNING BEARS SOUTH 23°40'05" EAST A DISTANCE OF 852.23 FEET FROM THE SOUTHWESTERLY CORNER OF BLOCK 96 OF SAID MISSION BEACH; THENCE NORTH 87°12'00" EAST 16.83 FEET TO A POINT THE EAST LINE OF SAID WEST DRIVE OF MISSION BOULEVARD; THENCE NORTH 02°48'00" WEST ALONG SAID EAST LINE 40.25 FEET TO A POINT OF THE SOUTHERLY LINE OF THAT PARCEL OF LAND DESCRIBED IN FINAL ORDER OF CONDEMNATION TO THE CITY OF SAN DIEGO, A CERTIFIED COPY OF WHICH WAS RECORDED OCTOBER 15, 1947 IN BOOK 2522, PAGE 40 OF OFFICIAL RECORDS; THENCE NORTH 87°12'00" EAST ALONG SAID SOUTHERLY LINE, BEING ALSO THE NORTHERLY LINE OF THAT CERTAIN PARCEL OF LAND DESCRIBED AS PARCEL 2 IN THE DEED FROM THE MISSION BEACH COMPANY, TO THE STATE OF CALIFORNIA, DATED JULY 5, 1934, AND RECORDED SEPTEMBER 27, 1934 IN BOOK 323, PAGE 340 OF OFFICIAL RECORDS, IN THE OFFICE OF SAID COUNTY RECORDER, A DISTANCE OF 90.56 FEET (RECORD 92.56 FEET) TO THE WESTERLY LINE OF THAT CERTAIN PARCEL OF LAND IN SAID PUEBLO LOT 1803 DESCRIBED IN THE DEED OF THE MISSION BEACH COMPANY, TO THE CITY OF SAN DIEGO: DATED SEPTEMBER 5, 1940 AND RECORDED SEPTEMBER 13, 1940 IN BOOK 1077, PAGE 116 OF OFFICIAL RECORDS, IN THE OFFICE OF SAID COUNTY RECORDER, SAID WESTERLY LINE BEING THE WESTERLY LINE OF MISSION BOULEVARD AS DEDICATED AND NAMED BY RESOLUTION NO. 72228 OF THE COUNCIL OF SAID CITY ADOPTED SEPTEMBER 10, 1940; THENCE NORTH 02°48'00" WEST ALONG SAID WESTERLY LINE OF MISSION BOULEVARD A DISTANCE OF 282.82 FEET, MORE OR LESS, TO THE SOUTHEASTERLY CORNER OF THAT CERTAIN PARCEL OF LAND DESCRIBED AS PARCEL 2 IN THE DEED FROM THE MISSION BEACH COMPANY, TO THE SAN DIEGO ELECTRIC RAILWAY COMPANY, DATED FEBRUARY 14, 1942, AND RECORDED FEBRUARY 20, 1942 IN BOOK 1301, PAGE 478 OF OFFICIAL RECORDS, IN THE OFFICE OF SAID COUNTY RECORDER; THENCE CONTINUING ALONG THE WESTERLY LINE OF SAID MISSION BOULEVARD ORTH 02°48'00" WEST, 29.67 FEET TO THE BEGINNING OF A CURVE TO THE LEFT WHICH IS CONCAVE TO THE WEST AND HAS A RADIUS OF 1980.00 FEET; THENCE TANGENT TO SAID LAST DESCRIBED COURSE ALONG THE ARC OF SAID CURVE THROUGH AN ANGLE OF 06°30'00" A DISTANCE OF 224.62 FEET TO THE END OF SAID CURVE; THENCE CONTINUING ALONG SAID WESTERLY LINE OF MISSION BOULEVARD AND TANGENT TO SAID LAST CURVE, NORTH 09°18'00" WEST, 74.68 FEET TO A POINT; SAID POINT BEING THE INTERSECTION OF SAID COURSE WITH THE WESTERLY LINE OF WEST DRIVE OF MISSION BOULEVARD AS DESCRIBED IN DEED FROM MISSION BEACH COMPANY TO THE CITY OF SAN DIEGO RECORDED, MARCH 6, 1924 IN BOOK 999, PAGE 64, OF DEEDS FILED IN SAID COUNTY RECORDER'S OFFICE, AND THE BEGINNING OF A CURVE CONCAVE TO THE NORTHWEST WITH A RADIUS OF 158.92 FEET, THE TANGENT TO SAID CURVE BEARS SOUTH 08°36'00" WEST FROM SAID POINT; THENCE SOUTHWESTERLY ALONG SAID WESTERLY LINE OF SAID WEST DRIVE OF MISSION BOULEVARD, ALONG THE ARC OF SAID CURVE, THROUGH AN ANGLE OF 22°55'35", A DISTANCE OF 63.59 FEET TO THE BEGINNING OF A REVERSE CURVE TO THE LEFT HAVING A RADIUS OF 348.41 FEET AND WHICH IS CONCAVE TO THE SOUTHEAST; THENCE CONTINUING ALONG SAID WESTERLY LINE OF WEST DRIVE, ALONG THE ARC OF SAID CURVE THROUGH AN ANGLE OF 34°19'35" A DISTANCE OF 208.74 FEET; THENCE TANGENT TO SAID CURVE AND CONTINUING ALONG THE WESTERLY LINE OF WEST DRIVE OF MISSION BOULEVARD SOUTH 02°48'00" EAST A DISTANCE OF 73.33 FEET TO THE SOUTHWESTERLY CORNER OF SAID PARCEL 2 PARCEL OF LAND DESCRIBED IN DEED TO SAN DIEGO ELECTRIC RAILWAY COMPANY RECORDED FEBRUARY 20, 1942 IN BOOK 1301, PAGE 478 OF OFFICIAL RECORDS, ABOVE REFERENCED AND THE NORTHWESTERLY CORNER OF THE PARCEL OF LAND DESCRIBED IN FINAL ORDER OF CONDEMNATION RECORDED OCTOBER 15, 1947 IN BOOK 2522, PAGE 40, OF OFFICIAL RECORDS, HERETOFORE REFERRED TO; THENCE SOUTH 02°48'00" EAST ALONG SAID WESTERLY LINE OF WEST DRIVE TO THE POINT OF BEGINNING.

PARCEL C:

THAT CERTAIN REAL PROPERTY IN PUEBLO LOT 1803 OF THE PUEBLO LANDS OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 1809 FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, NOVEMBER 13, 1924, BEING A PORTION OF THE UNNUMBERED TRACT LYING BETWEEN THE NORTHERLY LINE OF SAN FERNANDO PLACE AND THE SOUTHERLY LINE OF VENTURA PLACE, AS SHOWN ON SAID MAP, DESCRIBED AS FOLLOWS:

ALL THAT PROPERTY SOUTH OF PARCELS A AND B DESCRIBED ABOVE LYING NORTHERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT OF THE WESTERLY RIGHT-OF-WAY OF MISSION BOULEVARD AS DESCRIBED IN DEED RECORDED SEPTEMBER 13, 1940 IN BOOK 1077, PAGE 116 OF OFFICIAL RECORDS AND AS NAMED AND DEDICATED BY RESOLUTION NO. 72228 OF THE CITY COUNCIL OF THE CITY OF SAN DIEGO AND ADOPTED SEPTEMBER 10, 1940, SAID POINT LYING 764 FEET, MORE OR LESS, SOUTH OF AND PARALLEL TO THE SOUTHERLY LINE OF VENTURA PLACE; THENCE SOUTH 89°12'00" WEST TO THE EASTERLY LINE OF THE BOARDWALK.



VENTURA PLACE
SOUTHERLY LINE

NO SCALE

PACIFIC OCEAN

EASTERLY LINE OF BOARDWALK

PORTION OF

PARCEL A

NOT A PART

PUEBLO LOT 1803

WEST DRIVE

PARCEL B

MISSION BLVD.

FACE OF CURB @
PARKING LOT

PARCEL C
SUBWAY, PRADO ST.

TOTAL LEASEABLE AREA: 7.4 ac. ±

PLAT ACCOMPANYING
EXHIBIT A

SHOLDERS & SANFORD, INC.
Planning  Engineering  Surveying
3569 Fifth Avenue, San Diego, CA 92103
(619) 299-7772

# EXHIBIT 2

DUPLICATE

# FIFTH OPERATING MEMORANDUM TO PERCENTAGE LEASE

This Fifth Operating Memorandum to Percentage Lease is dated _June 26,_ 2000 ["Effective Date"] by and between the City of San Diego, ["CITY"] and Wave the Planet, LLC, a California Limited Liability Company ["LESSEE"], who are collectively referred to hereinafter as ["the Parties"], with respect to the following facts:

## RECITALS

A.    WHEREAS, the CITY and Belmont Park Associates entered into a Percentage Lease dated March 4, 1987 for the development and operation of Belmont Park; an Operating Memorandum to Percentage Lease dated December 23, 1987; a Second Operating Memorandum to Percentage Lease dated December 11, 1990; a Third Operating Memorandum to Percentage Lease dated February 25, 1991; and a Fourth Operating Memorandum to Percentage Lease dated August 12, 1991 [collectively, the "Lease"]; and

B.    WHEREAS, PARS Belmont Park, LLC was successor in interest to Belmont Park Associates in that Lessor Consent, Estoppel, and Non-Disturbance Agreement dated December 1, 1995, which interest was subsequently assigned to Wave the Planet, LLC as successor in interest to PARS Belmont Park, LLC in that Assignment of Ground Lease dated June 22, 2000; and

C.  WHEREAS, the Parties desire to revitalize Belmont Park ["the Leasehold"], by including in the Leasehold appropriate park visitor-oriented commercial and recreational uses, specifically the installation of water theme features consisting of a primary show wave, a half-pipe walk-through tunnel wave, a children's waye with "Swirl Pool," a "Point Break" wave, two training waves on roof top decks, and other appropriate miscellaneous water features ["the Features"]; and

D.  WHEREAS, to accomplish this revitalization, LESSEE has agreed, pursuant to a separate Management and Operations Agreement dated September 1, 1999, to hire Wave Loch Tool & Die, LLC, a company managed by Thomas J. Lochtefeld, who specializes in the design, manufacture, and operation of simulated wave machines and other interactive water-related recreational items, to manage the revitalization of the Leasehold; and

E.  WHEREAS, the Features are designed to enhance the attractiveness of the Plunge and to stimulate the economic viability and use of the existing restaurants and retail in the Leasehold; and

F.  WHEREAS, installation of the Features is consistent with the development permitted under the terms of the Lease; and

G.  WHEREAS, in order to improve traffic circulation in the area, CITY desires to build, at its sole cost and expense, a turn-around at the foot of Ventura Place near the northwest corner

DOCUMENT NO. 0293393

FILED    JUN 2 6 2000
OFFICE OF THE CITY CLERK
SAN DIEGO, CALIFORNIA

Page 1 of 8

Initials _____

of the north parking lot ["Turn-Around"], however, construction of the Turn-Around will reduce the total number of parking spaces in LESSEE'S north parking lot; and

H.  WHEREAS, to compensate LESSEE for the loss of parking, CITY intends to substitute an equal number of public parking spaces in the CITY-owned parking lot on the southern boundary of the Leasehold ["Relocated Parking"]; and

I.  WHEREAS, CITY is willing to permit, as consistent with Section 1.09 of the Lease, Parking, on a trial basis, and LESSEE desires to install and operate at its sole cost and expense, a nine-stall valet/passenger drop-off zone in its north parking lot; and

J.  WHEREAS, CITY is willing to permit, on a trial basis, and LESSEE desires to provide, a beach concession program to be located on the beach adjacent to the west boundary of the Leasehold; and

K.  WHEREAS, CITY is willing to permit, on a trial basis, and LESSEE is willing to install, a non-exclusive charter/shuttle bus drop-off in the CITY-owned south parking lot in order to enhance public access to the beach and the Leasehold.

NOW, THEREFORE, in consideration of the Recitals and the mutual obligations of the Parties as set forth herein, the Parties agree as follows:

## AGREEMENT

1.    Section 1.01. of the Lease, Premises, is amended as follows:

Exhibit A-1 attached to the Third Operating Memorandum to Percentage Lease is deleted and Exhibit "A-2," which is attached hereto and incorporated herein by this reference, is substituted as the true and correct legal description of the real property leased by CITY to LESSEE.  Exhibit "A-2" excludes the Turn-Around and reflects the reconfiguration of the City Lifeguard facility in the north parking lot.  Due to the loss of spaces within the Leasehold caused by the Turn-Around project, LESSEE'S parking requirements under the lease will be reduced by an equal number of spaces.  CITY will substitute an equal number of permanent public parking spaces in the CITY-owned parking lot south of the leasehold to ensure compliance with Coastal Development Permit #686-396.

2.    CITY agrees to obtain an American Land Title Association (ALTA) survey on the Leasehold, at its sole cost and expense, such that an endorsement may be added to LESSEE'S title insurance policy reflecting the new legal description of the Premises as described in Exhibit "A-2," and the preceding paragraph.

3.    The Parties acknowledge and agree that the Features are appropriate park visitor-oriented commercial recreational uses that are consistent with the basic concept of

Initials _____

the Development Plan discussed in Section 6.12 of the Lease and more fully described in Section 8.0 Contemplated Uses in Exhibit "C" of the Lease. LESSEE acknowledges and agrees that it must construct, operate, and maintain the Features in accordance with the terms of the Lease and with the Supplemental Development Plan attached hereto as Exhibit "C-1" and incorporated herein by this reference.

4.      Section 1.09 of the Lease, Parking, is amended to include the following paragraph:

Additionally, LESSEE may, subject to annual approval by CITY, per paragraph 10. below, install and operate a nine-stall valet/passenger drop-off zone in the north lot of the Premises, the exact location of which must be approved by CITY. Operation of this valet parking is subject to all other terms and conditions of this Lease, including Section 7.02 Compliance with Laws and Section 3.02(c) Percentage Rents.

5.      Section 2.04 of the Lease, Extension of Lease Term, is added to read as follows:

As a consideration for the capital commitment made by LESSEE sufficient to satisfy reasonable criteria as established by the City Manager, CITY shall consider LESSEE'S request for an extension of the Lease Term if the proposed Phase II improvements are approved.

6.      Section 3.02.d. of the Lease, Percentage Rate Adjustment, is amended to add the following paragraphs at the beginning of Section 3.02.d.:

The Parties agree that for a period of ten (10) years commencing on July 1, 2003, LESSEE shall pay to CITY percentage rent calculated at a rate of five percent (5%) of LESSEE'S gross income rather than three percent (3%) to seven percent (7%) of gross income depending upon the nature of the sale.

The first sentence therefore becomes the second sentence of Section 3.02.d. and is modified to read as follows:

At least four (4) months prior to the end of the twenty-fifth Lease Year and at least four (4) months prior to the end of each ten-year period thereafter, the Parties, by mutual consent or through appraisal as hereinafter set forth, will adjust the percentage rates of LESSEE'S gross income to be paid CITY, if appropriate, effective upon the first day of the succeeding ten-year period.

7.      Section 3.03 of the Lease, Rent Credit, is amended in its entirety to read as follows:

Initials

3.03 <u>Rent Credit</u>.  Public improvements were constructed as described in Exhibit "D" of the Lease (the "Public Improvements") and as further described in Exhibit "C-1."  In consideration for same LESSEE was provided with a Rent Credit, a portion of which is part of the tiered Rent Credit as restated and described below.  The Rent Credit shall be applied on a monthly basis against monthly installments of Minimum Rent and/or Percentage Rent due to CITY, until the Rent Credit balance is fully repaid or credited as more particularly prescribed in subparagraph a., b., c., herein.  The Rent Credits set forth below in subparagraphs a. and b. are fixed amounts and any Rent Credit described herein is intended to be fully expended.  No fees, interest charges or adjustments based on financing shall be applied to any of the Rent Credit calculations.  CITY shall not be liable for any unused Rent Credit upon expiration or early termination of this Lease.  No permanent improvements for which any rent credit is given shall be removed by LESSEE at any time without prior written approval of City Manager, including upon expiration or earlier termination of this Lease.

a.  Tier I - <u>Original Rent Credit</u>:  LESSEE shall receive a Rent Credit of Eight Million Five Hundred Thousand Dollars ($8,500,000).  The Tier I Rent Credit shall only be applicable to fifty percent (50%) of any Rent due in excess of the Minimum Rent payment described in Section 3.04.e.  The remaining rent due shall either be paid to CITY as cash or shall be offset by Tier 2 or Tier 3 Rent Credit as described below.

b.  Tier 2 - <u>New Capital Improvement Rent Credit</u>:  LESSEE shall receive a Rent Credit not to exceed Four Million Dollars ($4,000,000) as Tier 2 Rent Credit for approved expenditures related to Phase I Water Themed Features as set forth in the Supplemental Development Plan attached as Exhibit "C-1."  The Tier 2 Rent Credit shall expire ten (10) years from the Effective Date.  Any Tier 2 Rent Credit remaining upon expiration of this ten-year period shall be reduced to zero.  If the Tier 2 Rent Credit is expended prior to its ten -year sunset, then the remaining rent due after application of the Tier I Rent Credit shall either be paid to CITY as cash or shall be offset by the Tier 3 Rent Credit as described below.

c.  Tier 3 - <u>Plunge Building Re-Use and Additional Parking</u>.  LESSEE shall use all best efforts to develop an adaptive reuse of the Plunge Building and/or to construct additional parking to generate sufficient revenues to justify expenditure of funds for said reuse or construction.  If LESSEE is unable to develop such economic reuse, but still desires to redevelop the Plunge building and/or construct additional parking, LESSEE may request Additional Tier 3 rent credits to be treated similarly to Tier 2 rent credits from the date the improvement is placed in to service.  Approval of Tier 3 or any other additional rent credits shall be in the City's Manager's sole discretion.

Initials _____

8.    Section 4.02 of the Lease, <u>Assignment and Subletting</u>, paragraph four, is deleted in its entirety and amended to read as follows:

City Manager shall approve or disapprove any requested assignment or sublease, describing the reasons therefor, within thirty (30) days after presentation by LESSEE and, in the event that no written response either approving or denying approval is received during such period, such assignment shall be deemed approved, provided, however, that CITY may disapprove any assignment that does not comply with San Diego Charter section 225.

9.    Section 3.05 of the Lease, <u>Gross Income</u>, is amended to include the following paragraphs after the second full paragraph:

a.    <u>Offset to Gross Income by Capital Improvements</u>.  Upon completion of LESSEE'S initial capital investment (Phase I), LESSEE shall commit to spending at least two and one-half percent (2½%) of its gross income towards approved ongoing capital improvements described below.  The calculation of funds spent shall be two and one-half percent (2½%) percent of the total gross income during any consecutive four-year period commencing January 1, 2004 [" Total Capital Offset"].  In consideration for this commitment to enhance the Leasehold with approved ongoing capital improvements described below ["Approved Ongoing Capital Improvements"], LESSEE shall receive on an annual basis, as such funds are expended, a dollar-for-dollar offset to amounts it reports as gross income under this Section 3.05. ["Annual Capital Offset"].  The definition of Approved Ongoing Capital Improvements includes those costs that are associated with design, engineering, permitting, bonding, and construction (labor, materials, overhead, profit, third-party construction management fee, supervision and general conditions) for:

(1)    Improvements such as additional compatible food facilities, retail shops, rides, attractions, games, water features and/or picnic facilities which result in an increase in LESSEE'S gross revenue;

(2)    Improvement, enhancement, and/or renovation of an existing attraction, landscaping, parking area, food facility, retail shop, game, water feature and/or picnic facility, but only to the extent that such improvement is adding a new feature to an existing element and is not solely for maintenance purposes;

(3)    Improvements that increase the safety and security of Leasehold and/or patrons and employees;

(4)    Improvements installed for the purposes of any Accessory Use Permit, which is defined in Section 10.

Page 5 of 8

Initials

b.  In the event LESSEE has not expended funds for Approved Ongoing Capital Improvements equal to the Total Capital Offset, CITY shall receive the remaining balance as Additional Rent.  Such Additional Rent shall be paid in cash pursuant to the most recent audit at the end of the four year period and shall not be used to offset any rent credits, percentage rent or otherwise.

10.   Section 3.09 of the Lease, <u>Accessory Use</u>., is added to read as follows:

3.09  <u>Accessory Use</u>.  CITY agrees to issue to LESSEE a one-year renewable license/permit for compatible accessory uses ["Accessory Use Permit"], which is attached hereto as Exhibit "A-3" and incorporated herein by this reference.  At the outset, such uses shall include the rental and sales of specific goods and services on the beach area adjacent to the west boundary of the Premises, a non-exclusive charter/shuttle bus drop-off area, and a valet/passenger drop-off zone ["Accessory Uses"].

In consideration for CITY granting LESSEE a renewable license/permit  for Accessory Uses in accordance with the operations plan as described in the Supplemental Development Plan attached hereto as Exhibit C-1, LESSEE shall pay as additional minimum rent, an annual fee of Seventy Thousand Dollars ($70,000) payable in minimum monthly installments of Five Thousand Eight-Hundred Thirty-Three Dollars and 33 Cents ($5,833.33) ["Minimum Monthly Fee"].  The first Minimum Monthly Fee shall be due the first day of the Permit Term as defined in Exhibit "A-3."  LESSEE shall pay Percentage Rent on Accessory Uses equal to the applicable Percentage Rent for similar products or services as set forth in this Lease.  For the purpose of calculating Percentage Rent due, the Minimum Monthly Fee of Five Thousand Eight Hundred Thirty Three Dollars and 33 Cents ($5,833.33) shall be credited against any Percentage Rent due under the Lease.  If additional compatible Accessory Uses are permitted from time-to-time, additional minimum rent may be charged, depending upon the use.  However, in any event, LESSEE shall be required to pay the aforementioned Minimum Monthly Fee whether such Accessory Uses were awarded or deleted.

CITY agrees to consider in good faith annual renewal of the Accessory Use Permit provided that LESSEE complies with its terms and conditions.  Further, any decision to renew or approve any additional Accessory Uses shall be in the sole discretion of CITY.

11.   CITY agrees to assist in Lessee's efforts to establish non-exclusive off-site Mission Bay South Shores overflow parking, which may include charter/shuttle bus service.

12.   Except as amended hereby, all the provisions of the Lease shall remain unchanged and in full force and effect.

Initials 

IN WITNESS WHEREOF, this Fifth Operating Memorandum to Percentage Lease is executed by CITY, acting by and through its City Manager pursuant to Resolution No. R 293393 and by LESSEE, acting by and through its lawfully authorized officers.

CITY OF SAN DIEGO

Date: June 30, 2000    By: _____

Real Estate Assets Director

WAVE THE PLANET, LLC

Date: June 22, 2000    By: _____

Firouz D. Memarzadeh, Member

Date: June 22, 2000    By: _____

Thomas J. Lochtefeld, Member

APPROVED AS TO FORM AND LEGALITY

CASEY GWINN, City Attorney

Date: July 10, 2000    By: _____

Deputy City Attorney

Page 7 of 8

Initials _____

R 293393

LIST OF EXHIBITS TO
FIFTH OPERATING MEMORANDUM TO PERCENTAGE LEASE

1. Exhibit A-2     Legal Description of Premises  (To BE SUPPLIED, consisting of ___ pages)

2. Exhibit A-3     Accessory Use Permit, (consisting of 14 pages, plus 2 page Site Map of Permit Area).

3. Exhibit C-1     Supplemental Development Plan (consisting of 4 pages, plus Exhibit 1, 2 page Site Map of Permit Area and Exhibit 2, 1 page Approved Tier 2 Rent Credit List)

Initials _____

EXHIBIT "A-2"
LEGAL DESCRIPTION OF THE PREMISES


TO BE SUPPLIED

## LEGAL DESCRIPTION
## BELMONT PARK

All that portion of Pueblo Lot 1803 of Pueblo Lands, in the City of San Diego, County of San Diego, State of California, according to Map thereof made by James Pascoe in 1870, now known as Miscellaneous Map No. 36, and the unnumbered Tract of Mission Beach according to Map thereof No. 1809, filed in the Office of the County Recorder of San Diego County, more particularly described as follows:

Commencing at City of San Diego Survey Monument "Belmont" at the intersection of Ventura Place and Ocean Front Walk as shown on said Map of Mission Beach, said Monument having the NAD83 Coordinates of North 1862178.44 and East 6253378.64;   Thence South 16 47'57" East 59.92 feet;  Thence North 87 43'43" Est 85.71 feet, to the TRUE POINT OF BEGINNING;

Thence North 87°43'43" East  291.90 feet;  Thence South  2°15'49" East   6.00 feet;  Thence South 82°20'59" East  48.54 feet;  Thence South 2°16'26" East  15.35 feet;  Thence South 76 35'48" West 2.48 feet;  Thence North 87°43'43" East 8.27 feet;  Thence South 61°41'37" West 16.35 feet;  Thence South 45°45'21" West  16.67 feet;  Thence South 27°25'20.54" West 16.17 feet;  Thence South  8°24'19.85" West  16.24 feet;  Thence South  0°38'01" West  7.96 feet;  Thence South 11°09'17" East  16.51 feet;  Thence South 18°30'19" East  39.37 feet;  Thence South 66°18'36" West  7.24 feet;  Thence South 28°53'50" West  16.54 feet;  Thence South 12°19'33" West  16.04 feet;  Thence South 43°17'52" West  22.28 feet;  Thence North 48°34'08" West 3.43 feet;  Thence South 43°00'40" West 41.48 feet;  Thence South 45°46'40" East  3.49 feet;  Thence South 42°50'26" West 37.12 feet;  Thence South  2°17'55" West 52.83 feet, to a point on a curve, having a radius of 20.00 feet, concave Westerly, a radial line to said point bears North 10 48'02" East;  Thence Southerly along the arc of said curve a distance of 47.19 feet, through a central angle of 135°11'04" ;  Thence South  2°10'10" East 148.09 feet;  Thence South 43°40'47" East  8.93 feet;  Thence South 36°28'31" East  24.47 feet;  Thence South 64°33'39" East  24.49 feet;  Thence North 85°46'55" East  24.31 feet;  Thence North 62°28'44" East  16.27 feet;  Thence North 35°58'12" East  24.54 feet;  Thence North  6°21'22" East  32.32 feet;  Thence North  2°06'15" West 119.94 feet;  Thence North 2°33'20" West  63.36 feet; to a point on a curve, having a radius of  120.00  feet, concave Southeasterly, a radial line to said point bears South 87 26'40" West;  Thence Northeasterly along the arc of said curve a distance of 63.59 feet, through a central angle of  30°21'47";  Thence North 27°48'27" East  94.78 feet;  Thence North 27°52'25" East  15.98 feet;  Thence North 20°27'48" East  17.70 feet;  to a point on a curve, having a radius of  54.00  feet, concave Northwesterly, a radial line to said point bears South 69 32'15" East;

Page 1 of  2

Thence Northeasterly along the arc of said curve a distance of 9.70 feet, through a central angle of 10°17'47";  Thence North 81°13'48" East  7.51 feet, to the Westerly Right-of-way line of Mission Boulevard;  Thence South  8°46'27" East  71.87 feet;  to a point on a curve concave Westerly, having a radius of  1,980.00  feet, a radial line to said point bears North 81°13'33" East;  Thence along the arc of said curve a distance of  224.62 feet, through a central angle of 6°30'00";  Thence South  2°16'27" East 363.91 feet;   Thence South 87°40'33" West 511.36 feet;  Thence North  2°12'02" West 532.19 feet; Thence North 87°47'57" East  71.89 feet; Thence North  1°16'56" West  100.27 feet, Thence North 88°42'16" East 19.62 feet; Thence North  1°17'45" West   112.00 feet; Thence South 88°42'16" West  19.00 feet; Thence North 41°35'47" East  14.19 feet to the  POINT OF BEGINNING.

Above described parcel containing 313,978.86 square feet, 7.2079 acres.

Reference:

> A.L.T.A. Survey of Belmont Park, by Rick Engineering Company, 5620 Friars Road, San Diego, CA.  92110, dated 2-22-89, updated 12-17-1990.

_Lester E. Carter_          8-31-00

Lester E. Carter Jr.,    PLS 6148        Date
Sr. Land Surveyor, Field Engineering
My Registration Expires 3/31/2002

(seal)
LICENSED LAND SURVEYOR
L. E. CARTER JR.
Exp. 3-31-02
No. 6148
STATE OF CALIFORNIA

File: belmontx.lgl
W.O. 020084 - 8/31/2000 (lec)

EXHIBIT "A-3"
**CITY OF SAN DIEGO**
**ACCESSORY USE PERMIT**

THIS ACCESSORY USE PERMIT ("Permit") is executed between the CITY OF SAN DIEGO, a

municipal corporation, hereinafter called "CITY," and WAVE THE PLANET, LLC, hereinafter

called "PERMITTEE."

## SECTION 1:  LOCATION AND USES

1.1    Permit Area.  PERMITTEE shall be allowed to operate in: (A) the beach area
adjacent to the western boundary of the Belmont Park leasehold, excluding the
seawall and boardwalk ("Beach Concession Area"); (B) in the parking lot that
fronts the southern boundary of the Belmont Park leasehold ("Charter/Shuttle Bus
Area"); and (C) the north parking lot of the Leasehold ("Valet/Passenger Drop-Off
Zone") [collectively the "Permit Area"], as shown on Exhibit "A," which is
attached hereto and incorporated herein by this reference.

1.2    Permitted Uses.  This Permit is granted to PERMITTEE for the sole purpose of
allowing PERMITTEE to operate the following accessory uses:

(A) Beach Concession. PERMITTEE is authorized to operate a beach
accessory rental and food/non-alcoholic beverage concession serving the
general public in the Beach Concession Area, from two (2) hours after sunrise
to 10:00 p.m. from October 1 to March 31 and 11:00 p.m. from April 1 to
September 30, on the terms and conditions set forth herein.  PERMITTEE
shall be allowed to:

1.  place and rent beach chairs, umbrellas and cabanas in the Beach
Concession Area; and

2.  rent surfboards, body boards and sell beach necessities (e.g.
sunscreen, hats, towels, etc.) from the Beach Concession Area; and

3.  place temporary potted palm trees and shrubbery on the beach in the
Beach Concession Area, at a number and size as approved by City Life
Guard Service; and

4.  conduct the beach accessory rental concession and serve food and
non-alcoholic beverages with order service from a temporary central

Page 1 of 14

Initials _____

beach kiosk, of a design to be mutually agreed upon; or, serve food and non-alcoholic beverages in the Beach Concession Area directly to patrons who are using PERMITTEE'S rental cabanas, umbrellas or beach chairs.

(B) Charter/Shuttle Bus Area. PERMITTEE is authorized to monitor and coordinate a non-exclusive charter/shuttle bus drop-off and loading area in the Charter/Shuttle Bus Area. PERMITTEE understands and agrees that it may not accept any form of consideration for this charter/shuttle bus drop-off and loading area or preclude any charter/shuttle bus from using the area on a first-come, first-served basis.

(C) Valet/Passenger Drop-Off Zone. PERMITTEE shall be authorized to construct and operate a valet/passenger drop-off zone in the north parking lot of the Belmont Park leasehold.

1.3 Procedure for Monitoring Use of Beach Concession Area. CITY will monitor PERMITTEE'S use of the Beach Concession Area to ensure that the use is satisfactory to CITY and conforms to the terms of this Permit. CITY will evaluate PERMITTEE'S use of the Beach Concession Area in part by reviewing input from CITY's Park and Recreation Department, Police Department, and Lifeguard Services. CITY will evaluate any written notice from those departments to Real Estate Assets Department regarding the ongoing operations of PERMITTEE that do not constitute a life safety issue on or before April 1, 2001 and again on October 1, 2001. The Real Estate Assets Department will meet with PERMITTEE within ten (10) days of the above evaluation dates to discuss any comments on PERMITTEE'S operations and to require the implementation of mitigation measures if necessary. If the Real Estate Assets Department is notified of a life safety issue involving the Beach Concession Area, then PERMITTEE shall immediately implement any mitigation measures required by CITY.

1.4 Weight Restrictions. PERMITTEE shall not place any weight on the boardwalk exceeding three thousand (3,000) pounds at any time, including items in transit, unless PERMITTEE has received the prior written approval of CITY.

1.5 Storage. PERMITTEE shall not store any item in the Beach Concession Area or on any other CITY-owned land.

1.6 Special Events. On any date that CITY schedules a special event, CITY shall have the exclusive right to use or permit the use of all or a portion of the Permit Area. CITY shall give PERMITTEE advance written notice of any such special events. Whether an event constitutes a "special event" for the purposes of this Section is in the sole discretion of CITY.

Page 2 of 14

Initials _____

1.7    <u>Beach Maintenance</u>.  When CITY cannot groom the Beach Concession Area within two (2) hours after sunrise, CITY will notify PERMITTEE in advance of the need to mutually schedule a time frame when the beach will be completely cleared of PERMITTEE'S property in order to accommodate beach grooming.

1.8    <u>Obligation to Diligently Operate</u> .  PERMITTEE covenants to operate the Beach Concession Area for the above-specified purposes and to diligently conduct the business thereon to produce a reasonable and substantial gross income.

1.9    <u>Related Council Actions</u>.  By the granting of this Permit, neither CITY nor the Council of CITY is obligating itself to any other governmental agent, board, commission, or agency with regard to any other discretionary action relating to development or operation of the Permit Area.  Discretionary action includes but is not limited to rezonings, variances, environmental clearances, or any other governmental agency approvals which may be required for the development and operation of the Permit Area.

1.10    <u>Competent Management</u>.  Throughout the term of this Permit, PERMITTEE shall provide competent management of the Permit Area to the satisfaction of the City Manager.  For the purposes of this paragraph, "competent management" shall mean demonstrated ability in the management and operation of beach accessory rentals, food/non-alcoholic beverage concession, charter bus drop-off and related activities in a fiscally responsible manner.

1.11    <u>Political Activities</u>.  The Permit Area shall be used  exclusively for the purposes specified in Section 1.2 <u>Permitted Uses</u>, hereof.  The Permit Area shall not be used for working or campaigning for the nomination or election of any individual to any public office, be it partisan or nonpartisan.  Provided, however, that PERMITTEE shall not be precluded from providing a forum for open public debate by candidates such as occurs at a "candidate forum" and similar events.

1.12    <u>Public Use</u>.  The general public shall not be excluded from any portion of the Permit Area.  PERMITTEE may propose reasonable restrictions for the use of the Permit Area provided they are consistent with the rights of the general public.  PERMITTEE agrees that all activities conducted on the Permit Area shall be as stated in Section 1.2 <u>Permitted Uses</u>, hereof.  Implementation of any restrictions in the Permit Area will not occur without advance written approval by CITY.

PERMITTEE shall, at all times during the Permit Term, defined in Section 2.1 below, maintain a CITY-approved sign identifying the Beach Concession Area as CITY-owned and available for public use consistent with the terms of this Permit.  The sign shall be installed by PERMITTEE at a location agreeable to CITY.

Initials _____

## SECTION 2:  TERM

2.1   <u>Commencement</u>.  The term of this Permit shall commence on October 1, 2000 and expire on September 30, 2001 ("Permit Term").

2.2   <u>Holdover</u>.  Any use of the Permit Area by PERMITTEE after the expiration of the Permit Term shall be construed to be on a month-to-month basis, and all other terms and conditions of this Permit shall continue in full force and effect.

2.3   <u>Renewal</u>.  CITY agrees to consider in good faith annual renewal of this Permit provided that LESSEE complies with its terms and conditions. Further, any decision to renew shall be in the sole discretion of City Manager.

## SECTION 3: CONSIDERATION

3.1   <u>Time and Place of Payment/Payment Procedure</u>.  All fees required herein must be paid in conjunction with the rent payment for the Belmont Park lease, filed in the Office of the City Clerk as (Document No. RR-266064), and the first through the fifth Operating Memorandums (collectively, the "Belmont Park Lease"), all of which are incorporated herein by this reference.

3.2   <u>Consideration</u>.

   a.   <u>Minimum Monthly Fee</u>.  The Minimum Monthly Fee established for Permit Term is Five Thousand Eight Hundred Thirty Three and 33/100 Dollars ($5,833.33) which shall be payable on the first day of the month beginning with the first day of the Permit term ("Minimum Monthly Fee").

   b.   <u>Percentage Fees</u>.  LESSEE shall pay percentage fees equal to the applicable Percentage Rent for similar products or services as set forth in Section 3.02(c) of the Belmont Park Lease ("Percentage Fees").  Percentage Fees will be adjusted based on the provisions of Section 3.02(d), <u>Percentage Rate Adjustment</u>, of the Belmont Park Lease.  For the purpose of calculating the Percentage Rent due under the Belmont Park Lease, the Minimum Monthly Fee of Five Thousand Eight Hundred Thirty Three Dollars and 33 Cents ($5,833.33) shall be credited against any Percentage Rent due.  Nothing in this Section 3 shall be construed to relieve PERMITTEE from its obligation to make an annual Seventy Thousand Dollar ($70,000) payment to a Mission Beach area traffic mitigation fund. If additional compatible Accessory Uses are permitted from time-to-time, additional minimum rent may be charged, depending upon the use.

The fees specified herein shall not be reduced by any interference with PERMITTEE'S operation caused by:

Initials

    i.   inclement weather;
    ii.  beach maintenance;
    iii. demolition, construction repair or maintenance of the seawall; or
    iv. sweeping activities.

## SECTION 4:  ASSIGNMENT

4.1    <u>Time is of Essence; Provisions Binding on Successors</u>.  Time is of the essence of all of the terms, covenants, and conditions of this Permit, and, except as otherwise provided herein, all of the terms, covenants, and conditions of this Permit shall apply to, benefit, and bind the successors and assigns of the respective parties, jointly and individually.

4.2    <u>Assignment</u>.  PERMITTEE shall not assign any of its rights under this Permit. Any such assignment shall automatically terminate this Permit.

4.3    <u>Encumbrance</u>.  PERMITTEE shall not encumber this Permit by deed of trust, mortgage, chattel mortgage, or other security instrument during the term hereof.

4.4    <u>Defaults and Remedies</u>.  In the event that:

(1)    PERMITTEE shall default in the performance of any covenant or condition required by this Permit to be performed by PERMITTEE and shall fail to cure said default within thirty (30) days following written notice thereof from CITY; or if any such default is not curable within thirty (30) days, and PERMITTEE shall fail to commence to cure the default(s) within said thirty-day period and diligently pursue such cure to completion; or

(2)    PERMITTEE shall voluntarily file or have involuntarily filed against it any petition under any bankruptcy or insolvency act or law; or

(3)    PERMITTEE shall be adjudicated a bankrupt; or

(4)    PERMITTEE shall make a general assignment for the benefit of creditors;

then CITY may, at its option, without further notice or demand upon PERMITTEE or upon any person claiming rights through PERMITTEE, immediately terminate this Permit and all rights of PERMITTEE and of all persons claiming rights through PERMITTEE to the Permit Area or to possession thereof; and CITY may enter and take possession of the Permit Area.  Provided, however, in the event that any default described in Section 4.3a.(1), herein above is not curable within thirty (30) days after notice to PERMITTEE, CITY shall not terminate this Permit pursuant to the default if PERMITTEE immediately commences to cure the default and diligently pursues such cure to completion.

Initials _____

4.5    <u>Waiver</u>. Any CITY waiver of a default is not a waiver of any other default. Any waiver of a default must be in writing and be executed by the City Manager in order to constitute a valid and binding waiver. CITY delay or failure to exercise a remedy or right is not a waiver of that or any other remedy or right under this Permit. The use of one remedy or right for any default does not waive the use of another remedy or right for the same default or for another or later default. CITY'S acceptance of any fee is not a waiver of any default preceding the fee payment. CITY and PERMITTEE specifically agree that the property constituting the Permit Area is CITY-owned and held in trust for the benefit of the citizens of the City of San Diego and that any failure by the City Manager or CITY staff to discover a default or take prompt action to require the cure of any default shall not result in an equitable estoppel, but CITY shall at all times, have the legal right to require the cure of any default when and as such defaults are discovered or when and as the City Council directs the City Manager to take action or require the cure of any default after such default is brought to the attention of the City Council by the City Manager or by any concerned citizen.

## SECTION 5: INSURANCE RISKS/SECURITY

5.1    <u>Indemnity</u>. PERMITTEE agrees to defend, indemnify, protect, and hold the CITY, its agents, officers, and employees harmless from and against any and all claims asserted or liability established for damages or injuries to any person or property, including injury to PERMITTEE'S employees, invitees, guests, agents, or officers, which arise out of or are in any manner directly or indirectly connected with the development or operation of the Permit Area or the work and operations to be performed under this Permit, and all expenses of investigating and defending against same; provided, however, that PERMITTEE'S duty to indemnify and hold harmless shall not include any claims or liability arising from the established sole negligence, or sole willful misconduct of the CITY, its agents, officers, or employees.

5.2    <u>Insurance</u>.

a.    PERMITTEE shall take out and maintain at all times during the term of this Permit the following insurance at its sole expense:

(1)    <u>Commercial General Liability</u> insurance in the amount of not less than Two Million Dollars ($2,000,000) Combined Single Limit Liability with an occurrence claims form. This policy shall cover all injury or damage, including death, suffered by any party or parties from acts or failures to act by CITY or PERMITTEE or by authorized representatives of CITY or PERMITTEE on or in connection with the use or operation of the Permit Area.

Initials

(2)    <u>Fire, extended coverage</u>, and vandalism insurance policy on all insurable property on the Permit Area in an amount to cover 100 percent of the replacement cost. Any proceeds from a loss shall be payable jointly to CITY and PERMITTEE. The proceeds shall be placed in a trust fund to be reinvested in rebuilding or repairing the damaged property.

b.    PERMITTEE'S responsibility to maintain said insurance also includes the following:

(1)    <u>Additional Insured</u>. All insurance policies will name CITY as an additional insured, protect CITY against any legal costs in defending claims, and will not terminate without sixty (60) days' prior written notice to CITY. All insurance companies must be satisfactory to CITY and licensed to do business in California. All policies will be in effect on or before the first day of the Permit, except "course of construction fire insurance" shall be in force on commencement of all authorized construction on the Permit Area, and full applicable fire insurance coverage shall be effective upon completion of each insurable improvement. A copy of the insurance policy must remain on file with CITY during the entire term of the Permit. At least thirty (30) days prior to the expiration of each policy, PERMITTEE shall furnish a certificate(s) showing that a new or extended policy has been obtained which meets the terms of this Permit.

(2)    <u>Modification</u>. CITY, at its discretion, may require the revision of amounts and coverages at any time during the term by giving PERMITTEE sixty (60) days' prior written notice. CITY'S requirements shall be designed to assure protection from and against the kind and extent of risk existing on the Permit Area. PERMITTEE also agrees to obtain any additional insurance required by CITY for new improvements, in order to meet the requirements of this Permit.

(3)    <u>Accident Reports</u>. PERMITTEE shall report to CITY any accident causing more than Ten Thousand Dollars ($10,000) worth of property damage or any serious injury to persons on the Permit Area. This report shall contain the names and addresses of the parties involved, a statement of the circumstances, the date and hour, the names and addresses of any witnesses, and other pertinent information.

(4)    <u>Failure to Comply</u>. If PERMITTEE fails or refuses to take out and maintain the required insurance or fails to provide the proof of

Initials _____

coverage, CITY has the right to obtain the insurance. PERMITTEE shall reimburse CITY for the premiums paid with interest at the maximum allowable legal rate then in effect in California. CITY shall give notice of the payment of premiums within thirty (30) days of payment stating the amount paid, names of the insurer(s), and rate of interest. Said reimbursement and interest shall be paid by PERMITTEE on the first (1st) day of the month following the notice of payment by CITY.

Notwithstanding the preceding provisions of this Subsection (4), if PERMITTEE fails or refuses to take out or maintain insurance as required in this Permit or fails to provide the proof of insurance, CITY has the right to declare this Permit in default without further notice to PERMITTEE, and CITY shall be entitled to exercise all legal remedies in the event of such default.

5.3    Waste, Damage, or Destruction. PERMITTEE agrees to give notice to CITY of any fire or other damage that may occur on the Permit Area within ten (10) days of such fire or damage. PERMITTEE agrees not to commit or suffer to be committed any waste or injury or any public or private nuisance, to keep the Permit Area clean and clear of refuse and obstructions, and to dispose of all garbage, trash, and rubbish in a manner satisfactory to CITY. If the Permit Area shall be damaged by any cause which puts the Permit Area into a condition which is not decent, safe, healthy, and sanitary, PERMITTEE agrees to make or cause to be made full repair of said damage and to restore the Permit Area to the condition which existed prior to said damage; or, at CITY'S option, PERMITTEE agrees to clear and remove from the Permit Area all debris resulting from said damage and rebuild the Permit Area in accordance with plans and specifications previously submitted to CITY and approved in writing in order to replace in kind and scope the operation which existed prior to such damage, using for either purpose the insurance proceeds as set forth in Section 5.2 Insurance, hereof.

PERMITTEE agrees that preliminary steps toward performing repairs, restoration, or replacement of the Permit Area shall be commenced by PERMITTEE within thirty (30) days of the fire or damage, and the required repairs, restoration, or replacement shall be completed within a reasonable time thereafter. CITY may determine an equitable deduction in the minimum annual rent requirement for such period or periods that the Permit Area is unusable for the purposes of this Permit by reason of such damage.

## SECTION 6:  IMPROVEMENTS/ALTERATIONS/REPAIRS

6.1    Acceptance of Permit Area. By signing this Permit, PERMITTEE represents and warrants that it has independently inspected the Permit Area and made all tests, investigations, and observations necessary to satisfy itself of the condition of the

Initials _____

Permit Area. PERMITTEE agrees it is relying solely on such independent inspection, tests, investigations, and observations in making this Permit. PERMITTEE further acknowledges that the Permit Area are in the condition called for by this Permit, that CITY has performed all work with respect to the Permit Area, and that PERMITTEE does not hold CITY responsible for any defects, whether apparent or latent, in the Permit Area, including the presence of any hazardous wastes.

6.2     Entry and Inspection. CITY reserves and shall always have the right, but not the obligation, to enter said Permit Area for the purpose of viewing and ascertaining the condition of the same, or to protect its interests in the Permit Area, or to inspect the operations conducted thereon. In the event that such entry or inspection by CITY discloses that said Permit Area is not in a decent, safe, healthy, and sanitary condition, CITY shall have the right, after ten (10) days' written notice to PERMITTEE, to have any necessary maintenance work done at the expense of PERMITTEE, and PERMITTEE hereby agrees to pay promptly any and all costs incurred by CITY in having such necessary maintenance work done, in order to keep said Permit Area in a decent, safe, healthy, and sanitary condition. Further, if at any time CITY determines that said Permit Area is not in a decent, safe, healthy, and sanitary condition, CITY may at its sole option, without additional notice, require PERMITTEE to file with CITY a faithful performance bond to assure prompt correction of any condition which is not decent, safe, healthy, and sanitary. Said bond shall be in an amount adequate in the opinion of CITY to correct the said unsatisfactory condition. PERMITTEE shall pay the cost of said bond. The rights reserved in this section shall not create any obligations on CITY or increase obligations elsewhere in this Permit imposed on CITY.

6.3     Maintenance. PERMITTEE agrees to assume full responsibility and cost for keeping the Permit Area clean from litter and other beach debris and maintain and preserve the Permit Area in a decent, safe, healthy, and sanitary condition satisfactory to CITY.

6.4     Improvements/Alterations. Other than those temporary installations described above in Section 1.2 Permitted Uses, no improvements, structures, or installations shall be constructed on the Permit Area, and the Permit Area may not be altered by PERMITTEE without prior written approval by the City Manager.

6.5     Taxes. PERMITTEE agrees to pay, before delinquency, all taxes, assessments, and fees assessed or levied upon PERMITTEE or the Permit Area resulting from PERMITTEE'S use of the Permit Area. PERMITTEE recognizes and agrees that this Permit may create a possessory interest subject to property taxation, and that PERMITTEE may be subject to the payment of taxes levied on such interest, and that PERMITTEE shall pay all such possessory interest taxes. PERMITTEE further agrees that payment for such taxes, fees and assessments will not reduce any fees due CITY.

Initials _____

6.6     Signs.  PERMITTEE agrees not to erect or display any banners, pennants, flags, posters, signs, decorations, marquees, awnings, or similar devices or advertising without the prior written consent of CITY.  If any such unauthorized item is found on the Permit Area, PERMITTEE agrees to remove the item at its expense within 24 hours notice thereof by CITY, or CITY may thereupon remove the item at PERMITTEE'S cost.

6.7     Hazardous/Toxic Waste.  PERMITTEE will not allow the installation of additional underground storage tanks or release of hazardous substances in, on, under, or from the Permit Area.  For the purposes of this provision, a release shall include but not be limited to any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leeching, dumping, or otherwise disposing of hazardous substances.  "Hazardous substances" shall mean those hazardous substances listed by the Environmental Protection Agency in regularly released reports and any other substances incorporated into the State's list of hazardous substances.  A copy of the presently effective EPA and the State lists is on file in the Office of the City Clerk as Document 769704 and by this reference is incorporated herein.

In the event of any release of a hazardous substance, PERMITTEE shall be responsible for all costs of remediation and removal of such substances in accordance with all applicable rules and regulations of governmental authorities.

PERMITTEE agrees to assume the defense of, indemnify, and hold CITY harmless from any and all claims, costs, and expenses related to environmental liabilities resulting from PERMITTEE'S operations on the Permit Area, including but not limited to costs of environmental assessments, costs of remediation and removal, any necessary response costs, damages for injury to natural resources or the public, and costs of any health assessment or health effect studies.

If PERMITTEE knows or has reasonable cause to believe that any hazardous substance has been released on or beneath the Permit Area, PERMITTEE shall give written notice to the City Manager within ten (10) days of receipt of such knowledge or cause for belief.  Provided, however, if PERMITTEE knows or has reasonable cause to believe that such substance is an imminent and substantial danger to public health and safety, PERMITTEE shall notify the City Manager immediately upon receipt of this knowledge or belief and shall take all actions necessary to alleviate such danger.  PERMITTEE will notify the City Manager immediately of any notice of violation received or initiation of environmental actions or private suits relative to the Permit Area.  In addition, PERMITTEE shall not utilize or sell any hazardous substance on the property without the prior written consent of CITY.

Initials _____

## SECTION 7:  GENERAL PROVISIONS

7.1    <u>Notices</u>

    a.    Any notice required or permitted to be given hereunder shall be in writing and may be served personally or by United States mail, postage prepaid, addressed to PERMITTEE at:

        Wave the Planet, LLC
        7310 Miramar Road, Suite 625
        San Diego, California  92126

or at such other address designated in writing by PERMITTEE; and to CITY as follows:

        City Manager
        Attention:  Real Estate Assets Director
        City Administration Building
        202 "C" Street, M.S. 9B
        San Diego, CA  92101-4155

The notice shall be effective upon personal service or two (2) calendar days following deposit in the United States mail.

    b.    Any party entitled or required to receive notice under this Permit may by like notice designate a different address to which notices shall be sent.

7.2    <u>Compliance with Law</u>.  PERMITTEE shall at all times in the construction, maintenance, occupancy, and operation of the Permit Area comply with all applicable laws, statutes, ordinances, and regulations of CITY, county, state, and federal governments at PERMITTEE'S sole cost and expense.  In addition, PERMITTEE shall comply with any and all notices issued by the City Manager or his authorized representative under the authority of any such law, statute, ordinance, or regulation.

7.3    <u>CITY Approval</u>.  The approval or consent of CITY, wherever required in this Permit, shall mean the written approval or consent of the City Manager unless otherwise specified, without need for resolution by the City Council.

7.4    <u>Nondiscrimination</u>.  PERMITTEE agrees not to discriminate in any manner against any person or persons on account of race, color, religion, gender, sexual orientation, medical status, national origin, age, marital status, or physical disability in PERMITTEE'S use of the Permit Area, including but not limited to the providing of goods, services, facilities, privileges, advantages, and accommodations, and the obtaining and holding of employment.

Initials _____

7.5    Compliance with CITY'S Equal Opportunity Contracting Program.

    a.    Equal Opportunity Contracting. PERMITTEE acknowledges and agrees that it is aware of, and will comply with, City Council Ordinance No. 18173 (San Diego Municipal Code Sections 22.2701 through 22.2708, as amended), EQUAL EMPLOYMENT OPPORTUNITY OUTREACH PROGRAM, a copy of which is on file in the Office of the City Clerk and by this reference is incorporated herein. PERMITTEE and all of its subcontractors are individually responsible to abide by its contents.

    PERMITTEE will comply with Title VII of the Civil Rights Act of 1964, as amended; Executive Orders 11246, 11375, and 12086; the California Fair Employment Practices Act; and any other applicable federal and state laws and regulations hereafter enacted. PERMITTEE will not discriminate against any employee or applicant for employment on any basis prohibited by law.

    PERMITTEE submitted and CITY acknowledges receipt of a current Work Force Report or a current Equal Employment Opportunity (EEO) Plan as required by Section 22.2705 of the San Diego Municipal Code, which sets forth the actions that PERMITTEE will take to achieve the CITY'S commitment to equal employment opportunities.

7.6    Partial Invalidity. If any term, covenant, condition, or provision of this Permit is found invalid, void, or unenforceable by a court of competent jurisdiction, the remaining provisions will remain in full force and effect.

7.7    Captions. The Permit outline, section headings, and captions for various articles and paragraphs shall not be held to define, limit, augment, or describe the scope, content, or intent of any or all parts of this Permit. The numbers of the paragraphs and pages of this Permit may not be consecutive. Such lack of consecutive numbers is intentional and shall have no effect on the enforceability of this Permit.

7.8    Entire Understanding. This Permit and the Belmont Park Lease contain the entire understanding of the parties. PERMITTEE, by signing this Permit, agrees that there is no other written or oral understanding between the parties with respect to the Permit Area. Each party has relied on its own examination of the Permit Area, advice from its own attorneys, and the warranties, representations, and covenants of the Permit itself. Each of the parties in this Permit agrees that no other party, agent, or attorney of any other party has made any promise, representation, or warranty whatsoever which is not contained in this Permit.

    The failure or refusal of any party to read the Permit or other documents, inspect the Permit Area, and obtain legal or other advice relevant to this transaction constitutes a waiver of any objection, contention, or claim that might have been

Initials _____

based on these actions. No modification, amendment, or alteration of this Permit will be valid unless it is in writing and signed by all parties.

7.9   <u>Standard of Employees</u>. PERMITTEE and its employees shall at all times conduct themselves and the operations on the Permit Area in a creditable manner.

## SECTION 8:   SIGNATURES

8.1   <u>Signature Page</u>.

IN WITNESS WHEREOF, this Permit is executed by CITY, acting by and through its City Manager, and by PERMITTEE, acting by and through its lawfully authorized officers.

THE CITY OF SAN DIEGO

Date June 30, 2000

By _____

Director, Real Estate Assets

PERMITTEE:

WAVE THE PLANET, LLC

Date June 22, 2000

By _____
Firouz D. Memarzadeh, Member

Date June 22, 2000

By _____
Thomas J. Lochtefeld, Member

APPROVED AS TO FORM AND LEGALITY

CASEY G. GWINN, City Attorney

Date July 10, 2000

By _____
Deputy City Attorney

I:/WPO/GIBSON/accessory city 6-15-00b.doc

Page 13 of 14

Initials _____

0.293393

LIST OF EXHIBITS TO
ACCESSORY USE PERMIT

EXHIBIT "A"  -  <u>Site Map of Permit Area</u> (consisting of 2 pages)

Initials

EXHIBIT C-1
Page 1 of 4

## SUPPLEMENTAL DEVELOPMENT PLAN

**Overview:**  LESSEE anticipates investing thirteen million ($13,000,000) in
improvements to Mission Beach (Belmont) Park as follows:

**Phase I** of the Supplemental Development Plan anticipates a LESSEE investment of four
million ($4,000,000) dollars of program enhancements to Mission Beach Park within four
(4) years of the effective date of this Memorandum.  Improvements include:

- those described on Exhibit "2" attached hereto which are deemed approved qualified
  Tier 2 Rent Credit expenditures per paragraph 7 of the Fifth Operating Memorandum
  to Percentage Lease;

- addition of beach theme water recreational features that increase the attractiveness of
  the existing Plunge and provide an aquatic recreational sports draw for the adjacent
  boardwalk restaurants and associated north and west common area plazas;

- a trial one-year license to permit LESSEE to build and monitor a new charter/shuttle
  bus drop-off and loading space, in the CITY-owned lot that fronts the southern
  boundary of the Leasehold;

- identification of nine (9) valet/passenger drop-off parking spaces in the north
  Leasehold parking lot and a trial one year license to permit LESSEE to operate a
  parking valet service without diminishing the number of existing free first-come-first-
  serve parking;

- a trial one-year license to permit LESSEE  beach rentals and food service on a limited
  sand area adjacent to the west boundary of the Premises.

**Phase II** of this Supplemental Development Plan envisages LESSEE submitting to CITY within
six (6) years of the effective date of this Memorandum, and completing within ten (10) years of
the effective date of this Memorandum, a Phase II Capital Improvement Plan for an anticipated
nine million ($9,000,000) dollar capital investment in one or more of the following program
enhancements to Mission Beach and Mission Bay Park:

- addition of new water recreation and beach theme features to the Leasehold;

- structural refurbishment / adaptive re-use of the Plunge Building

- Leasehold parking structure to supplement the existing parking reservoir; and,

- Mission Bay South Shores overflow parking / shuttle service.

Initials

EXHIBIT C-1
Page 2 of 4

Descriptive details for Phase I and II program elements are as follows:

## Phase I –Detailed Description of Program Elements

### Recreational Water Attractions:

Two types of water recreation enhancements are proposed for Phase I: the first is a children's interactive water show and stationary surfing wave feature; the second is a simulated surfing attraction.

The children's interactive water show and a stationary surfing wave ("Waterplay") feature is proposed at the north end of the Plunge. The Waterplay feature is proposed to replace two existing trampolines now occupying the site. The trampolines will be moved to a new location in the Leasehold. Participant access to the Waterplay feature will be from the north common area plaza and through a new opening in the north end of the Plunge building. The water show components of the Waterplay feature and north common area plaza include: a walk-through tunnel wave; nighttime special sound and lighting effects; fountains; water mist projections; and music. The stationary surfing wave is a small training wave that may actually be surfed by the general public. Viewing of the interactive water show and Waterplay feature shall be available from the surrounding rooftops.

The simulated surfing attraction known as "The Wave Loch Flow Rider®" is proposed to be installed in three locations: the common area plaza west of the Plunge and on each of the rooftops of the respective boardwalk restaurants. The west common area plaza will host the "main show" wave. To provide adequate viewing space for the Flow Rider main show wave, rooftop seating and dining is available from the decks of the two restaurants adjoining the wave, and on walkways connecting the restaurants. The general public may actually ride the Flow Rider main show wave.

Two smaller training Flow Rider units are located on the rooftops of Buildings 5 and 6. The rooftop training Flow Riders are accessible to patrons from a set of existing stairs off the boardwalk. Use of each Flow Rider is controlled by a reservation "check-in" system. In general, only one user at a time is allowed to ride on each wave and 15 users are permitted in the immediate queue.

To aesthetically enhance the currently under-utilized space on the north end of the northerly restaurant, the patio shall be shifted approximately 15' east and extending it to the north Belmont Park property line. Fire pits with small fountains would be the main design feature of the proposed roof top decks and patio areas, which would be framed by arches matching the style of Belmont Park's existing historic arches.

### Accessory Uses:

**Beach Concessions:** Pursuant to a renewable <u>Accessory Use Permit</u> attached as Exhibit A-3, LESSEE shall provide beach accessories and food/non-alcoholic beverage service on the beach adjacent to Belmont Park as shown on Exhibit "1" Site Map of Permit Area.

Initials _____

EXHIBIT C-1
Page 3 of 4

**Charter/Shuttle Bus Area:**  Pursuant to a renewable <u>Accessory Use Permit</u> attached as Exhibit A-3. LESSEE, at its sole cost and expense, shall build and monitor, on a one year trial basis, a new charter/shuttle bus drop-off and loading space, in the CITY-owned lot that fronts the southern boundary of the Leasehold as shown on Exhibit "1" <u>Site Map of Permit Area</u>.

**Valet/Passenger Drop-off:**  Pursuant to a renewable <u>Accessory Use Permit</u> attached as Exhibit A-3, LESSEE shall build and operate, at its sole cost and expense, an nine-stall valet drop-off zone located in its north parking lot immediately adjacent Building 6 as shown on Exhibit "1" <u>Site Map of Permit Area</u>.

**<u>Phase II</u> - Detailed Description of Program Elements:**

**New Water Recreation and Beach Theme Features:**  Subject to local review and approval by the pertinent planning, design and community groups, development options include:

- a 'Cirque du Soleil' style water and wave show located in the east common area plaza currently occupied by the toy boat pond.  Expanded rooftop restaurants, amusements and viewing would surround the central courtyard.

- additional water recreation and group picnic areas located adjacent to or on top of the supplemental beach parking structures.

**Structural Refurbishment / Adaptive Re-use of the Plunge Building:**  In order to insure continued operation of the Plunge swimming pool, the Plunge Building requires major renovation in order to overcome design flaws and permit an economically viable adaptive re-use. LESSEE shall consider commercial uses within a historically rehabilitated Plunge Building which would serve park and beach visitors, including but not limited to:  an upper level hotel;  a surrounding beach culture and retail arcade;  participatory water attractions and games.

**Parking Structure(s):**  LESSEE shall review options and propose alternatives for designing and building parking structure(s) on the Leased Premises and adjacent areas (e.g., Bonita Cove parking lot or the adjacent City owned south parking lot), to supplement the existing beach parking reservoir by three hundred plus (300+) spaces, conditioned upon financial feasibility.

**Mission Bay South Shores Overflow Parking / Shuttle Service:**  To help alleviate beach and bay parking and traffic congestion, LESSEE shall review options and propose financially feasible alternatives for designing and building an overflow parking lot and shuttle service at the triangle parcel defined by Interstate 5, Sea World Drive and Pacific Highway.

I:\WPO\2000\Gibson\Exhibit C-1.doc

Initials

EXHIBIT C-1
Page 4 of 4

LIST OF EXHIBITS TO
EXHIBIT C-1

1. Site Map of Permit Area, consisting of 2 pages
2. Approved Tier 2 Rent Credit List, consisting of 1 page

Initials _____



EXHIBIT A





# EXHIBIT 2

## APPROVED TIER 2
## RENT CREDIT

Phase I Water Themed Features
& Support Facilities

| | | | |
|---|---|---|---:|
| 1) | General Conditions | $ | 75,000 |
| 2) | Architectural & Engineering | $ | 180,000 |
| 3) | Concrete | $ | 60,000 |
| 4) | Structural Steel | $ | 70,000 |
| 5) | Wood and Plaster | $ | 100,000 |
| 6) | Thermal and Moisture Protection | $ | 40,000 |
| 7) | Access | $ | 40,000 |
| 8) | Finishes | $ | 10,000 |
| 9) | Equipment | $ | 30,000 |
| 0) | Mechanical | $ | 100,000 |
| 1) | Electrical | $ | 60,000 |
| 2) | Sound, Light & Cameras | $ | 125,000 |
| 3) | Coatings | $ | 35,000 |
| 4) | Installation | $ | 30,000 |
| 5) | Medial Production Facilities | $ | 150,000 |
| 6) | Grand Stands | $ | 80,000 |
| 7) | Electrical | $ | 200,000 |
| 8) | Sub Frame | $ | 20,000 |
| 9) | Filtration Piping | $ | 20,000 |
| 0) | Water Containment | $ | 10,000 |
| 1) | Labor | $ | 100,000 |
| 2) | Sealing | $ | 10,000 |
| 3) | Wave Run Out | $ | 10,000 |
| 4) | POS / Web System | $ | 150,000 |
| 5) | Storage Containers | $ | 10,000 |
| 6) | Miscellaneous Equip/Parts | $ | 20,000 |
| 7) | Permitting | $ | 20,000 |
| 8) | Elevators - Handicap | $ | 120,000 |
| 9) | Pumps | $ | 155,000 |
| 0) | Motor Control Center | $ | 275,000 |
| 1) | Filter Equipment | $ | 90,000 |
| 2) | Wave Surface | $ | 195,000 |
| 3) | Signage | $ | 24,000 |
| 4) | SS Nozzle Assemblies | $ | 147,000 |

Total    $    2,761,000