John L. Smaha, Esq., Bar No. 95855
Gustavo E. Bravo, Esq., Bar No. 218752
John Paul Teague, Esq., Bar No. 254249
**SMAHA LAW GROUP, APC**
7860 Mission Center Court, Suite 100
San Diego, California 92108
Telephone:   (619) 688-1557
Facsimile:    (619) 688-1558

Attorneys for Debtor, Wave House Belmont Park, LLC

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>WAVE HOUSE BELMONT PARK, LLC,<br><br>Debtor. | CASE NO.: 10-19663-LT11<br><br>Chapter 11<br><br>DEBTOR'S MOTION TO EXTEND EXCLUSIVITY FOR DEBTOR'S PLAN OF REORGANIZATION UNDER 11 U.S.C. § 1121 AND TO EXTEND TIME TO ASSUME LEASE UNDER 11 U.S.C. § 365(d)(4)(B)(i)<br><br>DATE:  February 11, 2011<br>TIME:  10:00 A.M.<br>JUDGE: Hon. Laura S. Taylor<br>DEPT.: Three; Room 129 |

COMES NOW Wave House Belmont Park, LLC, the Debtor and Debtor-In-Possession (the "Debtor") in the above captioned Chapter 11 case, and moves this Court for an order, pursuant to 11 U.S.C. § 1121(d)(1) to extend the exclusive period within which the Debtor has the ability, to itself at the exclusion of all others, to file a plan of reorganization. The Debtor requests that the extension be from the current exclusivity date running to March 2, 2011 until June 1, 2011 which is a requested extension of 90 days and a corresponding extension for the approval of a plan extended from May 1, 2011 to July 30, 2011, also 90 days. Further, Debtor moves this Court, pursuant to Section 365(d)(4)(B) of Title 11 of the United States Code, Rule 9014 of the Federal Rules of Bankruptcy Procedure, and Local

Bankruptcy Rule 9014-5 for entry of an order extending the time to assume unexpired leases for ninety (90) days from the current date of March 2, 2011 until June 1, 2011.

## I.

## STATEMENT OF FACTS

The Debtor is the owner of a leasehold estate in that certain real property identified herein as the Subject Property. This Subject Property is commonly referred to as Belmont Park. Debtor is the lessee, by assignment, under that certain Percentage Lease dated March 4, 1987, by and between the City of San Diego and Belmont Park Associates, the original lessee, as amended by that certain Operating Memorandum to Percentage Lease dated December 23, 1987, that certain Second Operating Memorandum to Percentage Lease dated December 11, 1990, that certain Third Operating Memorandum to Percentage Lease dated February 25, 1991, that certain Fourth Operating Memorandum to Percentage Lease dated August 12, 1991, and that certain Fifth Operating Memorandum to Percentage Lease dated June 26, 2000 commonly identified as the Master Lease. (See Declaration of Thomas Lochtefeld, a true and correct copy of the Percentage Lease is attached to the Declaration Mr. Lochtefeld as Exhibit A). The Operating Memoranda did not alter and/or affect the pertinent provisions of the Percentage Lease in relation to the Debtor's emergency motion.

On or about February 12, 2008, the Debtor obtained a loan from EWB in the amount of $17,000,000 in order to improve various real properties on the Subject Property, to consolidate Debtor's debt and to solidify Debtor's cash holdings for operations. As part of the loan agreement, the Debtor granted a Leasehold Deed of Trust to EWB with an assignment of rents and fixture filing. The Leasehold Deed of Trust was recorded on or about February 12, 2008. EWB further filed a UCC Statement on or about February 12, 2008 in order to perfect its security interest on the Debtor's rents and personal property. (See Declaration of Thomas Lochtefeld). The City of San Diego consented to the encumbrance that East West Bank placed on Debtor's leasehold estate by way of a Consent to Encumbrance. (A true and correct copy of the Consent to Encumbrance is attached to the declaration of Mr. Lochtefeld as Exhibit B).

The Percentage Lease provides a specific section on Defaults and Remedies. Section 4.04 of the Percentage Lease reads as follows:

> "<u>Default</u>: In the event that: (1) LESSEE shall default in the performance of any covenant or condition required by this Lease to be performed by LESSEE and shall fail to cure said default within thirty (30) days following written notice thereof from CITY or if any such default is not curable within (30) days, shall fail to commence to cure the default(s) within said thirty (30) day period and diligently pursue such cure to completion; or (2) LESSEE shall voluntarily file or have involuntarily filed against it any petition under any bankruptcy or insolvency act or law; or (3) LESSEE shall be adjudicated a bankrupt; or (4) LESSEE shall make a general assignment for the benefit of creditors;
>
> then CITY may, at its option without further notice of demand upon LESSEE or upon any person claiming rights through LESSEE, immediately terminate this Lease and all rights of LESSEE and of all persons claiming rights through LESSEE to the premises or to possession thereof; and CITY may enter and take possession of the premises. Provided, however, in the event that any default described herein is not curable within thirty (30) days after notice to LESSEE, CITY shall not terminate this Lease pursuant to the default if LESSEE commences curative action within said 30-day period and thereafter diligently pursues such cure to completion.
>
> In the event that there is a deed of trust or mortgage on the leasehold interest, **CITY shall give the mortgagee or beneficiary written notice of the default(s) complained of, and the same mortgagee or beneficiary shall have thirty (30) days from such notice to cure the default(s) and diligently pursue such cure to completion.** The thirty-day period may be extended during such time as mortgagee or beneficiary pursues said cure with reasonable diligence.
>
> If the mortgagee or beneficiary shall be required to exercise its right to cure said default(s) through litigation or through foreclosure, then CITY shall have the option of the following courses of action in order that the default(s) may be expeditiously corrected: (1) CITY may correct said default(s) and charge the costs thereof to the account of LESSEE, which charge shall be due and payable on the date that the rent is next due after presentation by CITY to LESSEE and mortgagee or beneficiary of a statement of said costs. (2) CITY may correct said default(s) and may pay the costs thereof from the proceeds of any insurance fund held by CITY, CITY and LESSEE or by CITY and mortgagee or beneficiary, or CITY may use the funds of any faithful performance or cash bond on deposit with CITY, or CITY may call on the bonding agent to correct the default(s) or to pay the costs of correction performed by or at the direction of CITY. (3) CITY may terminate this Lease as to the rights of LESSEE by assuming or causing the assumption of liability for any trust deed or mortgage. LESSEE agrees to assume and pay and all penalties or bonuses required by the beneficiaries, trustees or mortgagees as a condition for early payoff of the related obligations by CITY. CITY may, as an alternative, substitute for the terminated LESSEE a new LESSEE reasonably satisfactory to the mortgagee or beneficiary. Any reasonable costs incurred by CITY in releasing to a new tenant shall be the responsibility of the terminated LESSEE, and LESSEE hereby agrees to reimburse CITY for any such costs.

---

DEBTOR'S MOTION TO EXTEND EXCLUSIVITY FOR DEBTOR'S PLAN OF REORGANIZATION UNDER 11 U.S.C. § 1121 AND TO EXTEND TIME TO ASSUME LEASE UNDER 11 U.S.C. § 365(d)(4)(B)(i)

3

      "Should the default(s) be noncurable by LESSEE, then any lender holding a beneficial interest in the leasehold, whose qualifications as an assignee have been approved by CITY, shall have the **absolute right to substitute itself to the estate of LESSEE hereunder and to commence performance of this Lease.** If such mortgagee or beneficiary shall give notice in writing of its election to substitute itself within the thirty-day period after receiving written notice by CITY of the default, and the default, if curable, is cured by such mortgagee or beneficiary, then this Lease shall not terminate pursuant to the default. In that event, CITY expressly consents to the substitution and authorizes the mortgagee or beneficiary to perform under this Lease with all the rights, privileges, and obligations of LESSEE, subject to cure of the default, if possible, by mortgagee or beneficiary. LESSEE expressly agrees to assign all its interest in and to its leasehold estate to mortgagee or beneficiary in that event." (Emphasis added, see Exhibit A to the declaration of Mr. Lochtefeld).

      On or about October 12, 2010, the City of San Diego submitted a 30-day notice of default on the Debtor. A subsequent 30-day notice was sent to EWB. The notice of default is based on an ongoing dispute between the Debtor and the City of San Diego as to the contractual amount of rent owed to the City of San Diego and various other disputes arising out of the Percentage Lease. Debtor will shortly seek the approval of special counsel in order to file a declaratory relief action against the Percentage Lease in order to resolve these pending issues with the City of San Diego. In the meantime, the Debtor filed for bankruptcy protection on November 3, 2010 prior to the expiration of the Debtor's and EWB's 30-day notice cure periods. (See Declaration of Thomas Lochtefeld).

      As a result of the notice given by the City of San Diego to EWB, EWB has demanded that the Debtor cure the Percentage Lease as a condition of the use of cash collateral (See the Declaration of John L. Smaha and Exhibit A thereto, a true and correct copy of an e-mail provided to Mr. Smaha by EWB's counsel). EWB has informed the Debtor that the city has required that EWB cure the lease by November 19, 2010 or that EWB's rights will be lost (See Declaration of John L. Smaha and Exhibit B thereto, a true and correct copy of a subsequent e-mail provided to Mr. Smaha by EWB's counsel). The Debtor has strongly disputed the City of San Diego's contentions as to the amount due under the Percentage Lease. The current request from the City of San Diego represents an increase in rent of almost 700% over amounts previously paid. The Debtor believes it has been severely harmed

by the actions of the City of San Diego and has sought redress (See Declaration of John L. Smaha).

As indicated above, the Debtor disputes a number of issues regarding the Percentage Lease and the increases claimed by the City of San Diego. The Debtor has commenced an adversarial action against the City of San Diego in this Court best identified as *Wave House Belmont Park, LLC v. The City of San Diego*, Case No. 10-90553-LT11 (the "Adversarial Action"). The Adversarial Action sets forth a number of factual allegations that he Debtor intends to prove in Court. A true and correct copy of the Adversary Complaint is attached as Exhibit C to the declaration of John L. Smaha and referenced herein as though fully set forth. The Adversarial Action requests declaratory relief that, among other things, would either allow the Debtor to proceed with Phase II and Phase III development including contractually required rent abatement provisions of the Percentage Lease or, in the alternative, if the City of San Diego shall not allow development to go forward and the Court does not order such development, the Debtor requests a reduction in rental to a reasonable rate without the Debtor's ability to develop the Subject Property. By the Adversarial Action's Second Cause of Action, Debtor also requests injunctive relief preventing the City of San Diego from declaring a default and terminating the Percentage Lease before the Debtor is allowed to litigate its pending claims. (See Declaration of John L. Smaha).

At a status conference before this Court, the parties agreed to a general schedule for proceeding with various items, including a hearing on the preliminary injunction regarding EWB's right to cure and the tolling of the same. The Debtor, the City of San Diego and EWB agreed that the matter would go on for hearing on February 11, 2011. The Debtor also set aside this hearing date for this instant motion and for various other motions. (See Declaration of John L. Smaha).

Since then, the parties have agreed to a stipulation by which the Debtor, the City of San Diego and EWB shall take part in a mediation in an attempt to resolve their disputes. The mediation has been tentatively scheduled for January 25 and/or 26, 2011. The stipulation, submitted to the Court and the order subsequently signed by the Court on

December 21, 2010, allows the City of San Diego an extension until February 21, 2011 to file an answer to the Adversarial Action. The parties to the Adversarial Action and EWB also agreed to suspend discovery until February 21, 2011. The hearing on the preliminary injunction was continued by the stipulation, and the subsequent order, to March 15, 2011, with opposition from the City of San Diego not due until February 21, 2011 and any reply from EWB and/or the Debtor will be due March 4, 2011. Likewise, a motion to expedite trial on the Adversarial Action will not be held until March 15, 2011. (See Declaration of John L. Smaha).

## II.

### CAUSE EXISTS FOR AN EXTENSION AS DEBTOR MEDIATES AND/OR LITIGATES ITS ACTION AGAINST THE CITY OF SAN DIEGO

Under 11 U.S.C. § 1121(b), the Debtor has an exclusive period for 120 days after the date of the order for relief under the Bankruptcy Code to file a plan of reorganization. The Debtor then has 180 days to have the plan of reorganization accepted by the court under 11 U.S.C. § 1121(c)(3). 11 U.S.C. § 1121 (d) provides that "on request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may for cause reduce or increase the 120-day period or the 180-day period referred to in this section."

The determination of whether cause exists lies within the discretion of the court and must be determined on a case by case basis, focusing on the unique circumstances and factual considerations that arise in each distinct case (See *In re Gibson & Cushman Dredgin Corp.*, (E.D.N.Y. 1989) 101 B.R. 405). A variety of matters probative of § 1121 (d) cause are standardly considered as expressed in two decisions (See *In re Henry Mayo Newhall Memorial Hospital*, (9th Cir.BAP 2002) 282 B.R. 444). Under the *In re Dow Corning Corp.* And *Express One*, decisions, a court must consider: (1) the size and complexity of the case; (2) the necessity of sufficient time to negotiate and prepare adequate information; (3) the existence of good faith progress toward reorganization; (4) whether the debtor is paying debts as they come due; (5) whether the debtor has demonstrated reasonable prospects for filing

a viable plan; (6) whether the Debtor has made progress in negotiating with creditors; (7) the length of time the case has been pending; (8) whether the debtor is seeking the extension to pressure creditors, and (9) whether unresolved contingencies exist (See *In re Express One Int'l. Inc.*, (Bankr. E.D. Tex. 1996) 194 B.R. 98, 100 and *In re Dow Corning Corp.*, (Bankr.E.D.Mich. 1997) 208 B.R. 661). It is not necessary that all of the considerations raised by these two decisions be met, only that the aggregate facts support a finding of cause to extend the exclusive period (See *In re Henry Mayo Newhall Memorial Hospital*, (9th Cir.BAP 2002) 282 B.R. 444 at 452; found for extension where the application was for a (1) first extension (2) in a complicated case (3) that had not been pending for a long time, relative to its size and complexity (4) in which the debtor did not appear to be proceeding in bad faith (5) had improved operating revenues (6) had shown a reasonable prospect for filing a viable plan, (7) was making progress in negotiating with creditors (8) did not appear to be seeking an extension to pressure creditors and (9) was not depriving interested parties with material or relevant information). In the instant case, the Debtor believes it meets more than enough of the various listed factors to warrant this extension.

1.   *Size and Complexity of Case.*

The Debtor's bankruptcy case, per se, is not extremely large and, but for the issues with the Percentage Lease and the City of San Diego, it would not be extremely complex. However, the fact of the matter is, the Debtor has been forced to commence litigation with the City of San Diego and the issues that this dispute raise are certainly complex and must be resolved before the Debtor has any chance of preparing a disclosure statement and plan of reorganization. Otherwise, the Debtor would be faced with the prospect of developing a plan that would necessarily have too many unknowns and a disclosure statement that would be too confusing, even for the most sophisticated of creditors to follow. Debtor would have to provide for one plan of action in the event the litigation goes forwards and succeeds in full, another plan of action that would anticipate the litigation having only partial success, one in which the Debtor's Adversarial Action was fully unsuccessful and EWB decided not to take possession and, finally, one in which Debtor's Adversarial Action was fully

unsuccessful and in which EWB opted to take advantage of one or more of its options under the Percentage Lease. The most expeditious use of the Court's, the Debtor's and creditors time and effort will be in resolving the Debtor's Adversarial Action and drafting a plan of reorganization that will depend largely on how the dispute with the City of San Diego is resolved.

2. *Sufficient Time to Negotiate and Prepare Adequate Information.*

As indicated above, the Debtor will take part in a mediation with the City of San Diego on January 25 and/or 26, 2011. Debtor hopes that such a mediation will result in a fair resolution for all parties involved, but as the Court must be aware, settlement is not a foregone conclusion in any case. If there is a resolution on that day, the Debtor would immediately commence work on drafting a disclosure statement and plan that would comply with any settlement reached with the City of San Diego and EWB. If that occurs, it may take weeks just to finalize the language of a settlement. Debtor would then begin gathering the necessary and relevant information for a disclosure statement, information which may change depending upon any such settlement. Even if the Debtor settled on January 25, 2011, it is not a guarantee that the Debtor could file a disclosure statement and plan by the current March 2, 2011 deadline.

If there is no resolution, the City of San Diego will have until February 21, 2011 just to file its answer on the Adversarial Action. A motion to expedite the Adversarial Action would not be heard by the Court until March 15, 2011. Clearly, the Debtor's ability to resolve the dispute with the City of San Diego will not be present at the time the exclusivity period runs.

3. *First Request in a Case That Has Not Been Pending For Long.*

The Debtor filed for bankruptcy protection on November 3, 2010. The case has been pending for only about two months and this would be Debtor's first application to request an extension on the exclusivity period. Given the timing of the Debtor's Adversarial Action, it may not be the last. For purposes of this motion, however, this factor also weighs in favor of granting Debtor's motion.

4.  *Debtor Is Paying Debts As They Come Due.*

The Debtor continues to operate its business on the Subject Property and is paying all debts as they come due, including making payments to the City of San Diego and to EWB. As expressed in Debtor's most recent operating report, the Debtor is making all payments as they come due, including mortgage payments to EWB and lease payments to the City of San Diego. The limited amount of accounts payables were made shortly after the end of the first accounting period. Further, as reflected by the profit and loss statement, the Debtor is operating with a monthly net income of over $70,000.00. See Exhibit D to the Declaration of John L. Smaha, a true and correct copy of the Debtor's November, 2010 operating report. Debtor's counsel if further informed by the Debtor that the Debtor continues to operate on a positive cash flow basis and is paying all debts as they come due.

5.  *Reasonable Prospects In Filing A Viable Plan.*

The Adversarial Action and the related issues between the Debtor, the City of San Diego and EWB must be resolved before the Debtor can draft a plan of reorganization. Notwithstanding this, the Debtor believes that the operating income of the Debtor is enough to create a viable plan of reorganization if the Debtor can retain the Percentage Lease and continue in operation. If the worst case scenario happens, and Debtor is forced out of the Percentage Lease, the Debtor will still have the opportunity to file a plan of reorganization, albeit one wherein the Percentage Lease is rejected and the Debtor liquidates its other assets. When the Adversarial Action is resolved, the Debtor will have a reasonable prospect of filing a viable plan, as to which plan the Debtor proposes depends on the outcome of said Adversarial Action.

6.  *Progress In Negotiating With Creditors.*

As expressed above, the Debtor, the City of San Diego and EWB will have a mediation on January 25 and/or 26, 2011. The fact that the parties are willing to sit down before a disinterested third party and attempt to resolve their dispute is, of course, a very positive step. If the mediation results in an agreement, or moves the parties significantly closer to an agreement, the Debtor will undoubtedly be prepared to proceed with a plan of

reorganization and will give the Debtor the backbone for said plan. If it is not successful, the parties to the Adversarial Action are already in agreement that the matter should be handled on an expedited basis. As such, progress has been made and the Debtor has a reasonable likelihood of resolving the Adversarial Action, one way or another, in a fairly quick manner, but not likely within the current exclusivity date.

7. *Not Intended to Pressure Creditors/Not Withholding Information.*

The main parties in this matter are aware of the timing of the Adversarial Action. As such, the City of San Diego and EWB are aware that the dispute with the City of San Diego may take additional time to resolve. There is no ulterior motive for seeking this extension, other than to ensure that the Debtor has enough time to negotiate and/or litigate the Adversarial Action in good faith and have the ability to then prepare a plan of reorganization based on the results thereof. In the meantime, the Debtor shall continue to operate and make all ongoing debt payments.

8. *Unresolved Contingency Exists.*

Last, but certainly not least, the Debtor has a large, unresolved contingency in the Adversarial Action. As expressed above, it is the resolution of this contingency that will determine what "shape" the Debtor's plan will take. As indicated above, the Debtor and the City of San Diego intend to move the Adversarial Action forward as quickly as possible, however, it is likely that the matter may not be resolved by March 2, 2011, the current date when exclusivity runs out. As such, given the above factors all weighing in favor of granting the extension, the Debtor respectfully requests that the Debtor's motion for an extension of the exclusivity be granted as prayed for above.

### III.

### CAUSE ALSO EXISTS TO EXTEND THE ASSUMPTION DEADLINE FOR LEASES

A motion to assume or reject is timely so long as it is "made" within the applicable deadline. The motion need not be granted by the court within the deadline. (*In re Victoria Station Inc.* (9th Cir. 1988) 840 F.2d 682, 684; see also *In re Southwest Aircraft Services,*

*Inc.* (9th Cir. 1987) 831 F.2d 848, 849–850 [motion to extend deadline must also merely be "made" within deadline provided "cause" for extension also exists at time motion "made"].) A motion is deemed "made" when served (rather than when filed with the court). (*Id.* [motion timely when mailed on 60th day even though not received and filed with the court until 3 days later].) Service by mail is considered complete when the papers are properly placed in the mail. (FRBP 9006(e).)

On motion of the trustee/DIP or lessor, the court may extend the deadline for assumption or rejection of a nonresidential (i.e., commercial) real property lease under which the debtor is the lessee, for 90 days. Further extensions require lessor's consent: The court may grant subsequent extensions "only upon prior written consent of the lessor in each instance." (11 USC § 365(d)(4)(B)(ii).). Notice to creditors is not required. Nevertheless, the Debtor's counsel has contacted EDI's counsel by phone and will provide a copy of this motion by personal service to EDI's counsel.

All motions to extend the assumption/rejection deadline must be supported by a showing of "cause." (11 USC § 365 (d)(1), (4).) In determining whether there is "cause" for an extension courts normally consider: (1) whether the lease or contract is the debtor's primary asset; (2) whether the debtor is current on its post-petition rental or other contractual payments; (3) whether the case is exceptionally complex or involves numerous contracts or leases; and (4) whether the nondebtor parties to the contracts will suffer undue prejudice as a result of the extension. (*In re Muir Training Technologies, Inc.* (Bankr. S.D. CA 1990) 120 BR 154, 158–159; *In re Wedtech Corp.* (Bankr. S.D. NY 1987) 72 BR 464, 471–472.)

1. *The Lease Is Debtor's Primary Asset.*

As expressed above, the Debtor's primary business is the operation of its business on the leasehold estate of the Subject Property. If the Debtor loses this leasehold estate, then the Debtor has no operations to speak of. However, if the Debtor assumes the Percentage Lease as it is currently being interpreted and applied by the City of San Diego, the Debtor will likely not be able to cure alleged arrearages or make ongoing lease payments at the amounts the City of San Diego is improperly demanding. The determination of the

Adversary Action is tantamount to the decision of the Debtor to continue operations by assuming the lease or the rejection of the lease and the closing down of operations. As discussed in detail above, the Debtor's Adversarial Action may take several months to resolve, in a worst case scenario, as such the Debtor needs to have the ability to assume or reject the Percentage Lease after March 2, 2011.

2.    *Current On Post-Petition Rental Payments.*

The Debtor has made rent payments to the City of San Diego on a consistent basis since the filing of the bankruptcy. The amount owed to the City of San Diego, is an issue that needs to be litigated between the parties, however, the Debtor is making payments in the previous contractual amount. The issue of whether the City of San Diego's claims of increasing rents shall be determined by the Debtor's Adversarial Action.

3.    *Case is Exceptionally Complex.*

Although the Debtor's case is not necessarily complex as a whole, it is the Adversarial Action that adds substantial complexity to the Debtor's current situation and makes the assumption or rejection of the Percentage Lease practically impossible. As indicated above, the Adversarial Action may be resolved as soon as January 25 and/or 26, 2011, however, a resolution by mediation is never a foregone conclusion and the Debtor may be required to fully litigate the Adversarial Action. Although the parties have agreed to litigate the Adversarial Action on an expedited basis, the required time period for the mediation, the motion to expedite the action itself and the stipulated dates will necessarily push the litigation beyond March 2, 2011.

4.    *No Undue Prejudice to Non-Debtor Parties.*

Debtor is not aware of any prejudice resulting from the extension of Debtor's ability to assume or reject the Percentage Lease to the City of San Diego. The Debtor is making monthly payments to the City of San Diego. Further, the Debtor is maintaining the Subject Property and is not allowing the property to fall into disrepair. The Adversarial Action must be resolved one way or another before the City of San Diego can take any action against the Percentage Lease or the Subject Property. The extension, by ninety days, of the option to

assume or reject the Percentage Lease will not prejudice the City of San Diego. All other creditors, including EWB, will only be helped by this extension, as the treatment of their claims will only be determined after the Adversarial Action is resolved and allowing the Debtor time to make the best decision on the Percentage Lease after the resolution of the Adversarial Action will serve to allow the Debtor to treat all creditors fairly in a plan of reorganization after the Debtor knows how the Percentage Lease dispute will be resolved.

Ordinarily, a motion to extend the date to assume or reject a lease does not require a noticed motion under 11 U.S.C. § 365(d)(4)(B). However, given the fact that various matters were already on calendar for February 11, 2011 and the Debtor's interest in having these matters considered by the Court simultaneously, the Debtor respectfully requests that the Court take this matter on a noticed basis and grant the Debtor's application to extend the assumption or rejection date as prayed for above.

## IV.
## CONCLUSION

The Debtor believes the various factors provided above weigh in favor of granting the Debtor's applications to extend the exclusivity period for filing of a plan of reorganization and to extend the date by which Debtor must assume or reject executory contracts and/or leases. Given the above, the Debtor respectfully requests that the Court grant Debtor's applications in full.

DATED: January 14, 2011

/s/ Gustavo E. Bravo
Gustavo E. Bravo
SMAHA LAW GROUP, APC
Attorneys for Debtor,
*Wave House Belmont Park, LLC*

W:\Wave House Belmont\Motion.Exclusivity.Assumption\100.Motion.Exclusivity.Assumption.wpd